Filed 10/7/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CB RICHARD ELLIS, INC., | |
| Plaintiff and Appellant, | G049803 |
| v. | (Super. Ct. No. RIC529827) |
| TERRA NOSTRA CONSULTANTS et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment and postjudgment orders of the Superior Court of Riverside County, Jacqueline C. Jackson, Judge. Judgment affirmed. Postjudgment order denying recovery of prejudgment interest affirmed. Postjudgment order denying recovery of attorney fees reversed.

Law Office of Brenda D.E. Yanoschik and Brenda D.E. Yanoschik for Defendants and Appellants Terra Nostra Consultants, Hanan Haskell, Israel Feit, Roy Matthew Haskin, Roy Randall Haskin, Jack DiLemme, and C&R Consultants, Inc.

Walters & Caietti and Robert M. Caietti for Defendants and Appellants Charles Ratzersdorfer, Naftali Ratzersdorfer, David Tarabulsi, Avi Gross, Moshe Gross,

---

[*]     Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion parts IB, IC and IIB.

Zvi Tennenbaum, Yair Weill, Zvi Frankenthal, Haim Weiss, Zvi Ben Zvi, Amiram Lasker, Dov Schwartz, Tomy Deutsch, Jacob Oren, Eitan Feldbaum, and Bruce G. Keeton, as trustee of the Bruce G. Keeton Trust.

Corbett, Steelman & Specter, Ken E. Steelman, and Susan J. Ormsby for Plaintiff and Appellant.

\*          \*          \*


Plaintiff CB Richard Ellis, Inc. (CBRE), citing a 2004 listing agreement, sought a commission after the 2005 sale of 38 acres of land in Murrieta, California (the Property).  Arbitration proceedings between CBRE and the seller, Jefferson 38, LLC (Jefferson), resulted in a confirmed arbitral award in CBRE's favor, but no monetary satisfaction for CBRE because Jefferson had no assets by the time of the arbitral award and judgment.

This action represents CBRE's attempt to recover damages from Jefferson's individual members.  A jury trial resulted in a $354,000 judgment in favor of CBRE.[1]  Both defendants and CBRE appeal the judgment, citing alleged errors pertaining to jury instructions, the admissibility of evidence, juror misconduct, attorney fees, and

---

[1]          Judgment was entered against the following 25 defendants:  C&R Consultants, Inc.; Jack DiLemme; Israel Feit; Hanan Haskell; Roy Matthew Haskin; Roy Randall Haskin; Haskin, Inc.; Jack DiLemme, Inc.; Terra Nostra Consultants; Zvi Ben Zvi; Tomy Deutsch; Eitan Feldbaum; Zvi Frankenthal; Avi Gross; Moshe Gross; Bruce G. Keeton, trustee of the Bruce G. Keeton Trust; Amiram Lasker; Jacob Oren; Charles Ratzersdorfer; Naftali Ratzersdorfer; Dov Schwartz; David Tarabulsi; Zvi Tennenbaum; Yair Weill; and Haim Weiss.  Each defendant was held jointly and severally liable up to a specific individual maximum liability, which was established by the jury for each defendant based on the amount distributed to that defendant upon dissolution of Jefferson.  Judgment was entered by default with regard to two of the defendants, Haskin, Inc., and Jack DiLemme, Inc.  The other 23 defendants appealed the judgment and appear by counsel before this court.

2

prejudgment interest. We reject the parties' contentions, except with regard to CBRE's entitlement to attorney fees.

FACTS

In March of 2004, CBRE and Jefferson signed an exclusive sales listing agreement for the Property. CBRE agreed to use its "best efforts to effect a sale" of the Property within the term of the listing agreement. Subject to certain exclusions, Jefferson agreed to pay a sales commission of 6 percent of the gross sales price for any sale completed within the term of the listing agreement. Utilizing its expertise and contacts, CBRE sought a buyer for the Property.

On September 16, 2004, Covenant Development, Inc. (Covenant), through its agent David Stolte of NAI Capital, transmitted a letter of intent to Jefferson to purchase the Property for $11 million. Jefferson directly responded to Stolte the next day with a counteroffer of $12 million. Before this exchange of letters, an individual representing Jefferson told Stolte that Jefferson had fired CBRE because they had not moved the sale forward fast enough.

Meanwhile, CBRE continued to market the Property. On November 10, 2004, CBRE contacted a Jefferson representative regarding additional potential buyers. Jefferson responded with a letter the next day, stating Jefferson's position that the listing agreement expired six months from its March 8, 2004 listing date. Jefferson acknowledged a pending letter of intent identifying Walmart as a prospective buyer, a deal that would result in a commission for CBRE. But Jefferson otherwise expressed its dissatisfaction with CBRE's performance, which (according to the letter) led Jefferson to allow the listing agreement to expire. CBRE claims the term of the listing agreement was

3

actually one year, plus applicable extensions based on the circumstances of the sale.[2] There is no evidence CBRE took action to insert themselves into the negotiations between Jefferson and Covenant.

In a transaction between Jefferson and an entity to which Covenant assigned its interests, the sale of the Property eventually closed on July 11, 2005 for a gross sales price of $11,800,000. Escrow would have closed sooner but for two extensions requested and paid for by Covenant. NAI Capital (the buyer's agent) received a commission payment of $354,000 (i.e., 3 percent of the gross sales price) out of an aggregate commission of $708,000 (i.e., 6 percent of the gross sales price); the other half of the commission was paid to L. James Grattan & Associates, which was designated as the seller's agent. Roy Matthew Haskin (a defendant and judgment debtor) worked for L. James Grattan & Associates and began representing Jefferson as the seller's agent "right around [the] same time" Covenant submitted its offer. Roy Matthew Haskin personally received $264,000 for his services. CBRE did not receive a commission. There is no evidence CBRE attempted to make a claim upon the funds deposited into escrow.

On July 12, 2005, $11,025,625 was transferred into Jefferson's bank account as a result of the close of escrow. The next day, Jefferson transferred all but $474.45 out of its account. This money was ultimately transferred in varying amounts to defendants and others. There is no evidence CBRE made a claim upon Jefferson at this time or otherwise attempted to interfere with the distribution of funds.

---

[2] The first section of the agreement grants to CBRE "the exclusive right to sell the Property for a period commencing March 8, 2004 and ending midnight March 8, 2004." The parties are in agreement that this was a typographical error and that the listing agreement was not intended to apply for only one day. CBRE claims the agreement should have stated March 8, 2005 as the termination date. Jefferson claims it was a six month listing agreement and that the month was typed incorrectly (March rather than September). A fair amount of the lengthy trial was devoted to deciding this and related contract performance issues, although the parties' briefs largely ignore the trial testimony because of the nature of the appeal.

In July 2006, CBRE initiated arbitration against Jefferson in accordance with a clause in the listing agreement.  CBRE was apparently unsuccessful in its attempt to add four individuals to the arbitration who are now defendants and appellants (Roy Randall Haskin, Roy Matthew Haskin, Jack DiLemme, and Hanan Haskell).  The arbitration eventually proceeded as a default "prove-up" hearing because Jefferson did not (and claimed it could not) comply with its obligation to pay required deposits.  The arbitrator issued a $960,649.30 award in favor of CBRE, comprised of a 6 percent commission ($708,000), pre-award interest ($206,578.05), and attorney fees and costs ($46,071.25).  The arbitration award was confirmed and judgment entered in the amount of $985,439.80 by the Los Angeles Superior Court, a judgment affirmed on appeal.  (*CB Richard Ellis, Inc. v. Jefferson 38, LLC* (Oct. 21, 2010, B220598 [nonpub. opn.]).)

In June 2009, CBRE filed a complaint for breach of written contract and prohibited distributions in the instant case against defendants, the alleged individual members of Jefferson.  A jury trial commenced in July 2011.  By way of a special verdict, the jury found that CBRE and Jefferson entered into a contract, CBRE performed its contract obligations, all the conditions occurred that were required for Jefferson's performance, Jefferson failed to perform, and CBRE was harmed in the amount of $354,000 by that failure to perform.  The jury also found the dissolution of Jefferson occurred and Jefferson made a distribution to its members upon dissolution.  In separate special verdicts, the jury found each of the defendants were members of Jefferson, then specified the amount distributed to each of these defendants upon the dissolution of Jefferson.[3]

---

[3] This description oversimplifies matters for purposes of avoiding unnecessary confusion.  Actually, the jury found that the following defendants were not members of Jefferson:  C&R Consultants, Inc., KSI Funding, Inc. (KSI), Jack DiLemme, Roy Matthew Haskin, and Roy Randall Haskin.  But all of these defendants except KSI were found to be partners in Terra Nostra Consultants (which was a member of Jefferson) and were held liable for the judgment on that ground.

The court entered judgment in accordance with the special verdicts, awarding $354,000 to CBRE and against defendants (jointly and severally up to their individual limit as established by the jury's determination of the amount distributed to each defendant upon dissolution). The court denied CBRE's posttrial motions for attorney fees and prejudgment interest, as well as defendants' motions for a new trial and judgment notwithstanding the verdict.

DISCUSSION

I. Defendants' Appeal

Defendants do not challenge the sufficiency of the evidence with regard to any of the jury's factual findings, e.g., Jefferson's breach of contract, CBRE's damages, defendants' membership in Jefferson, or the amount distributed to each defendant upon Jefferson's dissolution. Instead, defendants claim they are entitled to a new trial based on instructional error, evidentiary error, and juror misconduct.

A. *Instruction of Jury Regarding Dissolution of Limited Liability Companies*

In general, members of a limited liability company are not liable for the "debts, obligations, or other liabilities" of the limited liability company. (Corp. Code, § 17703.04, subd (a); see *id*. subds. (b)-(e) [identifying ways in which members can be held liable, including alter ego liability, a member's participation in tortious conduct, and a member explicitly agreeing to personal liability for particular obligations].)[4]

---

[4] All statutory references are to the Corporations Code unless otherwise stated. The California Revised Uniform Limited Liability Company Act (§ 17701.01 et seq., added by Stats. 2012, ch. 419, § 20) took effect on January 1, 2014, supplanting the Beverly-Killea Limited Liability Company Act (former § 17000 et seq., repealed by Stats. 2012, ch. 419, § 19). We apply the Beverly-Killea Limited Liability Company Act because this dispute arose before 2014. But we will cite the revised statutes when there is

6

CBRE successfully argued that defendants should be held liable for Jefferson's breach of contract in failing to pay CBRE a commission. Part of CBRE's case involved proving Jefferson was a dissolved limited liability company, which lacked the ability to pay CBRE as a result of its distribution of assets to its members without reserving sufficient funds to pay CBRE. Former sections 17350 to 17357 (and current §§ 17707.01 to 17707.09) address the dissolution of limited liability companies and related issues. (See *Kwok v. Transnation Title Ins. Co.* (2009) 170 Cal.App.4th 1562, 1567.)

After dissolution, "[t]he dissolved company . . . 'continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it in order to collect and discharge obligations, disposing of and conveying its property, and collecting and dividing its assets.' [Citation.] After all known debts and liabilities of the company have been paid or adequately provided for, any remaining assets are distributed among the members according to their respective rights and preferences. [Citation.] A certificate of cancellation of the company may then be filed with the Secretary of State." (*Kwok v. Transnation Title Ins. Co.*, *supra*, 170 Cal.App.4th at p. 1568.)

CBRE brought its first cause of action for breach of contract against defendants pursuant to former section 17355, subdivision (a)(1),[5] which provided in relevant part: "Causes of action against a dissolved limited liability company, whether arising before or after the dissolution of the limited liability company, may be enforced against any of the following: [¶] (A) Against the dissolved limited liability company, to the extent of its undistributed assets . . . . [¶] (B) If any of the assets of the dissolved limited liability company have been distributed to members, against members of the

no relevant difference between the two acts or for purposes of comparing the provisions of the two acts.

[5] Section 17707.07, subdivision (a)(1), is nearly identical to former section 17355, subdivision (a)(1).

7

dissolved limited liability company to the extent of the limited liability company assets distributed to them upon dissolution of the limited liability company."

Thus, key issues in the case include when Jefferson dissolved and whether assets were distributed to defendants by Jefferson "upon dissolution."[6] The court (over defendants' objection) instructed the jury with CBRE's requested special instruction No. 2 as follows: "Dissolution of a limited liability company occurs when it ceases operating in the ordinary course of its business, with the intention, on the part of its members, not to resume the ordinary course of its business. Dissolution of a limited liability company is not the same as cessation of all business activity. A limited liability company may continue to do business after it has dissolved for the purpose of winding up its affairs, paying its creditors and distributing its remaining assets. [¶] In determining whether a dissolution of Jefferson . . . occurred, you may consider all evidence bearing on that issue, including; for example, the ordinary business of the limited liability company, the assets of the limited liability company both before and after a distribution, the continuation of the ordinary business and the cessation of its ordinary business activities."

Essentially, to avoid conditioning relief to CBRE on the precise date of formal dissolution, special instruction No. 2 utilizes the concept of "de facto" dissolution, i.e., the notion that dissolution can occur "although the formalities of corporate dissolution were not completed." (*Central Coast Baptist Assn. v. First Baptist Church of Las Lomas* (2007) 171 Cal.App.4th 822, 828; see *Hentschel v. Fidelity & Deposit Co.* (8th Cir. 1937) 87 F.2d 833, 836 ["A de facto dissolution . . . means that a dissolution has

---

[6] Special instruction No. 1, which was provided to the jury and is not challenged by defendants on appeal, states as follows: "To recover damages from defendants for Jefferson['s] breach of contract, [CBRE] also must prove all of the following, for each defendant: [¶] 1. The defendant was a member of Jefferson . . . . [¶] 2. Jefferson . . . dissolved; [¶] 3. The defendant received a distribution of funds from Jefferson . . . ; and [¶] 4. The distribution was made upon dissolution of Jefferson . . . ."

8

in circumstances and in fact taken place, as where the corporation by reason of insolvency, or other reason, suspends all its obligations and goes into liquidation without having technically availed itself of statutory procedure provided for that purpose"].)

Applying this instruction, the jury concluded that Jefferson dissolved and defendants received distributions upon dissolution, presumably based on undisputed evidence that Jefferson's only substantial asset was the Property, the proceeds of the July 2005 sale of the Property were distributed immediately after the sale, Jefferson conducted no substantial business after the close of escrow, and Jefferson filed a certificate of cancellation with the California Secretary of State on February 27, 2006 (signed February 16 by Hanan Haskell and Roy Randall Haskin) indicating Jefferson had been dissolved in a vote by all of its members.

Defendants contend special instruction No. 2 incorrectly states the law. The court rejected defendants' proposed special instruction on the issue, which tracked (nearly word for word) former section 17350.[7] Defendants' position is that the jury should have been limited to inquiring whether one of the three preconditions to dissolution (as stated in former § 17350, (1) an occurrence specified in the governing documents, (2) a majority vote of the members to dissolve, or (3) a judicial dissolution decree) had happened before distribution to defendants. According to defendants, the jury cannot be allowed to determine the date of dissolution by conducting a free-ranging

_____

[7]        "A limited liability company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of the following:  [¶]  (a) At the time specified in the articles of organization, if any, or upon the happening of the events, if any, specified in the articles of organization or a written operating agreement.  [¶]  (b) By the vote of a majority in interest of the members, or a greater percentage of the voting interests of members as may be specified in the articles of organization or a written operating agreement.  [¶]  (c) Entry of a decree of judicial dissolution pursuant to [former section] 17351."  (Former § 17350.)  Section 17707.01 is similar to former section 17350, although it adds one additional circumstance in which dissolution occurs (i.e., lack of any members for 90 days).

inquiry into when a limited liability company ceases to operate in the ordinary course of business. Thus, defendants posit, so long as the distribution of funds to members comes before the de jure dissolution of a limited liability company, the distribution was not "upon dissolution." (Cf. *Bacarella Transp. Services*, *Inc. v. Right Way Logistics, LLC* (D.Conn. 2009) 639 F.Supp.2d 249, 254-257 [granting summary judgment in favor of members because limited liability company was not dissolved at time of lawsuit].) By limiting "dissolution" to the specified statutory preconditions, defendants seek to prohibit the application of former section 17355 when the distribution precedes, as relevant here, the vote of the members to dissolve the limited liability company.

It is unclear whether the Legislature intended former section 17350 to preclude a determination (for purposes of an action pursuant to former § 17355 or otherwise) that a limited liability company dissolved prior to the date of any of the three circumstances specified. Certainly, the plain language of the statute[8] does not explicitly preclude that possibility. The statute does not say there are no other potential causes of dissolution. Nor does the statute indicate that satisfaction of one of the three statutory events is the exclusive determinant of dissolution. Pertinent legislative history likewise does not provide an answer to this question.

To break this interpretive logjam, we interpret former section 17350 in light of the purposes of the entire statutory scheme, and in particular the purpose of section 17355, subdivision (a)(1). It is self-evident that former section 17355, subdivision (a)(1), was designed to prevent the unjust enrichment of members of limited liability companies, when such members have received assets the dissolved company needs to pay creditors. (See *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 154 [former § 17355 "simply creates an enforcement mechanism so that company liabilities can be recovered out of distributed assets; it 'compel[s] [a member] to *return* distributed assets'"].) Other sections

_____

[8] A "limited liability company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of the following." (Former § 17350.)

10

contemplate that limited liability companies will not distribute funds to members without reserving sufficient assets to pay debts and liabilities. (Former §§ 17254, 17353.) If defendants' interpretation of the statutory scheme were correct, companies (and their members) could avoid the force of former section 17355, subdivision (a)(1)(B), by the simple expedient of transferring assets out of the company the day before voting to dissolve. On the other hand, CBRE's interpretation of former section 17350 allows for a jury to find that the company had actually dissolved at the time of the distribution, based on the reality of the company's finances and operations.

We agree with CBRE and hold that the jury was correctly instructed. "De facto" dissolution is an acceptable predicate to a claim under former section 17355, subdivision (a)(1)(B).


## B. *Admissibility of Arbitration Award at Trial*

Denying a motion in limine and overruling repeated objections by defendants, the court authorized the admission of evidence pertaining to the arbitral award against Jefferson, including exhibit 77, a copy of the arbitral award. Defendants contend the court erred because this evidence supposedly allowed the "jury to review, weigh, and be influenced by the Arbitrator's reasoning and factual determinations, which goes well beyond the permissible scope of judicial review of arbitration awards. The jury was to determine the facts based on the relevant evidence presented at trial, not based on an Arbitrator's determination of facts . . . . "

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will

11

(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We review the court's ruling as to the admissibility of evidence for an abuse of discretion. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) "'While the concept "abuse of discretion" is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded "'the bounds of reason, all of the circumstances before it being considered. . . .'"'" (*Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 762.)

The court explained its reasoning when it denied defendants' motion in limine: "I think the award . . . is relevant. I think this lawsuit makes no sense unless the jury knows how they got here. Just reality; people need to put things in context. Whether or not the . . . defendants . . . are liable, that's partly what they'll decide, but the fact that Jefferson . . . has an award against it matters, and a lot doesn't make sense without that knowledge. I'm familiar with it, and your case would make no sense to me without that knowledge. I have to assume that jurors, being normal people, would come to it with that same perspective, why am I here, what's the lawsuit about. [¶] So I would be inclined to allow it . . . ."

The court erred by admitting the entire arbitral award, complete with the arbitrator's factual findings and reasoning. As the court recognized, the arbitral award could not collaterally estop defendants. (See *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 824; *Gottlieb v. Kest*, *supra*, 141 Cal.App.4th at p. 154 [former § 17355, subds. (a)(3), (b) "does not permit a court to declare a member personally liable for fraud based solely on a judgment against the company"].) And, as explained above, Jefferson's individual members cannot be held to account for Jefferson's liabilities as a matter of course. (§ 17703.04, subd. (a).) CBRE needed to prove its breach of contract action at trial on the merits against defendants. To the extent the jury needed background

12

information concerning the arbitration to make sense of the case, the information could have been provided to the jury without revealing the arbitrator's factual findings and legal reasoning.[9]

But "'[n]o form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where in light of the entire record, there was no actual prejudice to the appealing party.' [Citation.] Accordingly, errors in civil trials require that we examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801-802; see Evid. Code, § 353, subd. (b) [no reversal of judgment based on erroneous admission of evidence unless it resulted in a "miscarriage of justice"].) To establish prejudice based on the wrongful admission of evidence, "an appellant must show a reasonable probability exists that, in the absence of the error, he or she would have obtained a more favorable result." (*People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882, 887.)

"[O]ur duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of a given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Defendants' briefs are entirely silent on the question of prejudice and defendants' appeal of this issue

---

[9] The factual findings and legal reasoning of the arbitrator should also have been excluded as inadmissible hearsay and opinion, although this was not the basis of defendants' objection at trial, nor do they make this argument on appeal. (Cf. *Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 148 ["factual findings in a prior judicial opinion are not a proper subject of judicial notice," unless the doctrines of res judicata or collateral estoppel apply].)

13

must therefore be deemed forfeited.[10]  (See *People ex rel. City of Santa Monica v. Gabriel*, *supra*, 186 Cal.App.4th at p. 887.)

Even if we were to overlook defendants' forfeiture and conduct a prejudicial error review without the benefit of briefing, we would conclude (based on our review of the record) that there is not a reasonable probability defendants would have obtained a more favorable result had the arbitration award been excluded from evidence. For one, the five-page award is terse and conclusory (and deals largely with the procedural history of the arbitration).  It does not wrestle with the factual complexities introduced at trial because it was a default proceeding.  Second, CBRE did not ask the jury to defer to the arbitrator's findings.  CBRE's counsel stated in closing argument, "I'm not suggesting that . . . the arbitrator is taking over your position.  You're going to independently determine the evidence as it's in here."  Finally, the jury did not simply adopt the arbitrator's view of the case.  Recognizing the need to pay the buyer's agent, the jury awarded only 3 percent of the purchase price as damages to CBRE rather than the full 6 percent commission set forth in the listing agreement (and awarded by the arbitrator, alongside interest, attorney fees, and costs).

## C.  Alleged Juror Misconduct

Defendants also claim they are entitled to a new trial based on alleged juror misconduct.  On appeal, defendants' assertion is limited to the accusation leveled by two jurors in posttrial declarations that a third juror (referred to as Juror B) said, at least three times during deliberations, that "if he could only tell [them] what he knew about these

---

[10]  Even though CBRE pointed out the lack of briefing as to the question of prejudice in defendants' opening brief, defendants' reply brief included no analysis of the prejudice question.  Indeed, at oral argument, counsel was at a loss to express a specific rationale as to why the error was prejudicial.

14

defendants and the ranch, [the jury] would see how these people are guilty, guilty, guilty." These declarations were very brief, consisting of a few sentences of information.

CBRE responded with a lengthier declaration from Juror B, which unequivocally denied any pretrial knowledge of or connection with the parties or the dispute at issue. Juror B denied conducting any independent research regarding the parties, attorneys, or dispute. Juror B attested, "At no time during the jury deliberations did I state to other jurors that I knew or knew of the defendants or the ranch and at no time did I ever state or suggest that I had any knowledge indicating the guilt or liability of any of the defendants outside of the evidence." "During the nearly two weeks of deliberations and extensive discussions with all jurors of the evidence, I did state to the other jurors that, based on all of the evidence presented, I believed that the defendants were liable to Plaintiff . . . ."

The court denied defendants' motion for new trial, observing that the two declarations supporting an inference of misconduct were "conclusory" and not credible, while Juror B's declaration was "detailed," "more convincing," and "most credible."

We review the court's denial of defendants' motion for a new trial for an abuse of discretion. (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.) "In determining whether misconduct occurred, we defer to the trial court's findings of historical fact and credibility determinations if they are supported by substantial evidence. [Citations.] Whether a prospective juror failed to disclose relevant information or answered falsely and whether he or she did so intentionally are questions of fact for the trial court to decide." (*Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 59.)

Here, there is substantial evidence supporting the court's conclusion that no misconduct occurred — Juror B's thorough declaration denying he had preexisting knowledge concerning defendants or that he uttered the alleged improper statement. The court explicitly rejected the credibility of the other two jurors based on their brief, conclusory declarations. That is the end of our inquiry; there is no need to decide

15

whether the court should have granted a new trial had it found Juror B actually said what he was accused of saying.[11]

## II. CBRE's Cross-appeal

CBRE limits its appeal to the court's denial of CBRE's posttrial motions for attorney fees and prejudgment interest.

### A. Attorney Fees

The court denied CBRE's motion for attorney fees on the ground that such an award was not authorized as a matter of law; thus, our review is de novo. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213.) "Unless authorized by either statute or agreement, attorney's fees ordinarily are not recoverable as costs." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 127 (*Reynolds*).)

CBRE claims attorney fees are authorized by the listing agreement (which was signed by Jefferson, not defendants)[12] in conjunction with CBRE's statutory basis for

---

[11] It is possible, though by no means clear, that defendants intended to argue within the same section of their brief that juror misconduct occurred because of the manner in which the jury came to award damages up to $1,067,975 against two of the defendants, Israel Feit and Hanan Haskell. The same two jurors' declarations indicated the jury "could not find evidence to support an amount distributed to Israel Feit, so the jury just guessed that Mr. Feit received the same amount as Mr. Haskell." On the other hand, Juror B declared, "the jury determined that Mr. Feit, having the same interest in Jefferson . . . as Mr. Haskell . . . and having been a managing member as was Mr. Haskell, we found he received the same distribution as Mr. Haskell." We do not reach this issue because "[n]o evidence is admissible . . . concerning the mental processes by which [a verdict] was determined." (Evid. Code, § 1150, subd. (a).) To the extent defendants intend to make a substantial evidence challenge to the verdict against Feit, they have forfeited this issue by failing to clearly make the argument under a separate heading in their brief and by failing to adequately summarize the record pertaining to this issue. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

[12] Paragraph 18 of the listing agreement states, "In the event of any dispute

16

recovery against defendants (i.e., Jefferson's members). We agree with CBRE's position and therefore reverse the court's order denying the recovery of attorney fees.

Former section 17355, subdivision (a)(1)(B), provides: "Causes of action against a dissolved limited liability company . . . may be enforced against any of the following:" "(B) If any of the assets of the dissolved limited liability company have been distributed to members, against members of the dissolved limited liability company to the extent of the limited liability company assets distributed to them upon dissolution of the limited liability company."

The statute explicitly authorizes CBRE to enforce its breach of contract "cause of action" against defendants. Thus, subject to the limitation that they cannot be held liable beyond the amount they were distributed "upon dissolution," Jefferson's members were deemed to be statutory parties to the contract with CBRE by reason of the jury's findings pertaining to Jefferson's dissolution. The obvious purpose behind this statute is to dissuade limited liability companies from distributing funds to its members without paying creditors (or reserving sufficient funds to pay contingent claims) during the winding up process. Because CBRE could recover attorney fees pursuant to the listing agreement against Jefferson, former section 17355 likewise authorizes the recovery of attorney fees against defendants (i.e., Jefferson's members), so long as the total recovery against any individual member does not exceed that member's distribution upon dissolution. Allowing defendants to escape payment of attorney fees would only

_____

between Owner and Broker relating to this Agreement, the Property or Owner's or Broker's performance hereunder, Owner and Broker agree that such dispute shall be resolved by means of binding arbitration . . . . The prevailing party in the arbitration proceeding shall be entitled to recover its expenses, including the costs of the arbitration proceeding, and reasonable attorneys' fees." In the attached schedule to the listing agreement, section 5 states in relevant part, "If Broker is required to institute legal action against Owner relating to this Schedule or any agreement of which it is a part, Broker shall be entitled to reasonable attorneys' fees and costs."

encourage abuses by limited liability companies seeking to avoid the payment of attorney fees when there are disputed creditor's claims.

Our statutory analysis is buttressed by *Reynolds*, *supra*, 25 Cal.3d 124. In *Reynolds*, our Supreme Court addressed whether nonsignatories to a contract can share the benefits and burdens of a prevailing party attorney fees clause. The plaintiff (a supplier) sued the defendants (shareholders and directors of a bankrupt corporation supplied by the plaintiff) on an alter ego theory. (*Id.* at p. 127.) The trial court rejected the alter ego theory and awarded attorney fees to the shareholder defendants, based on a contract signed by the bankrupt corporation. (*Ibid*.) Highlighting the policy of reciprocity established in Civil Code section 1717,[13] the *Reynolds* court affirmed the award. (*Reynolds*, at pp. 128-129.) "Its purposes require section 1717 be interpreted to further provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant." (*Id.* at p. 128.) *Reynolds* concluded that the shareholder defendants must be entitled to recover attorney fees because if they had lost, they clearly would have been held liable for the supplier's attorney fees as the alter egos of the bankrupt corporation. (*Id.* at p. 129; see also *Pueblo Radiology Medical Group, Inc. v. Gerlach* (2008) 163 Cal.App.4th 826, 828-829 [applying *Reynolds*].)

This is not an alter ego case. But the statutory remedy provided by former section 17355 is similar to alter ego doctrine in that it prohibits investors from inequitably

---

[13] "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

18

leaving creditors high and dry with an empty judgment against an insolvent entity. Likewise, had defendants prevailed on the merits in this action, CBRE should not have been able to disclaim its contractual obligation to pay attorney fees for an unsuccessful attempt to enforce the listing agreement. In sum, CBRE is entitled to an award of reasonable attorney fees as the prevailing party in this civil litigation.

We disagree, however, with CBRE's contention that it should be allowed to recover the attorney fees it incurred when it arbitrated its breach of contract claim with Jefferson. Defendants are simply not liable for any aspect of the arbitral judgment, whether for damages, attorney fees, costs, or interest. Former section 17355 does not hold members liable for judgments entered against a dissolved limited liability company. Instead, it authorizes third parties to enforce against members of a dissolved limited liability company the causes of action that ordinarily would be brought against the limited liability company.

## B. Prejudgment Interest

Finally, CBRE asserts the court erred by not awarding prejudgment interest. "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ." (Civ. Code, § 3287, subd. (a).) "Under section 3287[, subdivision (a)], 'the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim.' [Citation.] Courts generally apply a liberal construction in determining whether a claim is certain, or liquidated. [Citation.] The test for determining certainty . . . is whether the defendant knew the amount of damages owed to the claimant or could have computed that amount from reasonably available information. [Citation.] Uncertainty as to *liability* is irrelevant. . . . [Citation.] The certainty required by section 3287[, subdivision (a),] is not lost when the existence of liability turns on

19

disputed facts but only when the amount of damages turns on disputed facts. [Citation.] Moreover, only the claimant's damages themselves must be certain. Damages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by the defendant." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 535-536.)

CBRE claimed it was owed a commission on the $11.8 million sales price as of the date of the close of escrow. The jury awarded $354,000 in damages, which represents 3 percent of the sales price. This damage award is the same amount as was paid to each of the two brokers participating at the July 2005 escrow. With just these facts in mind, CBRE's claim for prejudgment interest looks like a slam dunk. (See *Martin v. Ede* (1894) 103 Cal. 157, 162 [prejudgment interest awarded on broker's commission, which was "capable of being made certain by computation"].)

Additional facts complicate the picture, however. The listing agreement required payment of a 6 percent commission to CBRE (not 3 percent). Although the listing agreement authorized CBRE to share the commission with a buyer's agent, it did not specify that the split would necessarily be equal. Testimony suggested commissions usually are split in this fashion, but not in all cases. In CBRE's initial arbitration filings *against Jefferson*, it requested $363,000 (on July 12, 2006), then $726,000 (on July 10, 2008). CBRE obtained a judgment of $985,439.80 (including damages, attorney fees, interest, and costs) against Jefferson as a result of the confirmed arbitral award. CBRE's complaint requested the same $985,439.80 in damages against defendants, which included but was not limited to a $708,000 commission (i.e., 6 percent of the sales price). (See *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 961 ["The greater the disparity between the complaint and the damages, . . . the less likely prejudgment interest is appropriate"].) There is no evidence CBRE demanded at any time before trial that defendants pay $354,000 (or even $708,000) to satisfy CBRE's claim.

20

On appeal, CBRE acknowledges there were at least two possible damage awards:  $708,000 (6 percent) or $354,000 (3 percent).  But CBRE argues the jury's selection of the lower figure represents an offset, which should not affect CBRE's right to prejudgment interest.  Indeed, some of the defendants pleaded offset as an affirmative defense, claiming CBRE would be required to share any commission with cooperating brokers.

This is a difficult issue.  Had CBRE consistently requested and advocated for a commission of $354,000, it would have been entitled to prejudgment interest.  But under the specific circumstances of this case, damages were uncertain and unliquidated. The jury was instructed with a modified version of CACI No. 350, which pertains to contract damages.[14]  The jury was tasked with determining the harm suffered by CBRE as a result of any breach by Jefferson that might have occurred.  The jury was not instructed to consider the effect of cooperating broker commissions as an affirmative defense or offset.  In closing argument, CBRE's counsel stated damages amounted to 6 percent of the sales price ("over $700,000").  Neither defense counsel argued in their closing arguments for $354,000 to be awarded because of the need to pay a buyer's agent

---

[14]  "If you decide that [CBRE] has proved its claim against a specific defendant for breach of contract you also must decide how much money will reasonably compensate [CBRE] for the harm caused by the breach.  This compensation is called 'damages.'  The purpose of such damages is to put [CBRE] in as good a position as it would have been if Jefferson . . . had performed as promised but not in an amount greater than the distribution, if any, made to that specific defendant upon dissolution of Jefferson . . . .  [¶]  To recover damages for any harm, [CBRE] must prove:  [¶]  1. That the harm was likely to arise in the ordinary course of events from the breach of the contract; or [¶] 2. That when the contract was made, both parties could have reasonably foreseen the harm as the probable result of the breach.  [¶]  [CBRE] also must prove the amount of its damages according to the following instructions.  It does not have to prove the exact amount of damages.  You must not speculate or guess in awarding damages.  [¶] [CBRE] claims damages for unpaid commission."

commission. Neither defense attorney mentioned the issue of damages, preferring to argue there was no liability for a number of reasons.

During its deliberations, the jury indicated in four questions that it was struggling with the issue of damages, in particular the question of whether CBRE was harmed in the amount of a 6 percent commission or a 3 percent commission.[15] Counsel for both sides agreed the question of damages, in particular the question of 3 percent versus 6 percent, was a factual dispute. Substantial evidence would support either award, as it was unclear whether CBRE would have been able to secure the entire 6 percent commission had Jefferson not breached the listing agreement. Substantial evidence might also support an award of damages other than the two options focused on by the jury, on the theory that a 3 percent buyer's commission is not set in stone. The court invited counsel to address the jury. Interestingly, at this late stage, defense counsel argued that the correct amount of damages would be $363,000. One might speculate this was simply a misstatement or miscalculation, but it is nonetheless fitting that, to the end of the trial, the supposedly clear, liquidated number was not being used by either party.

---

[15] In two questions, the jury sought further explanation as to what a jury instruction meant by stating, "the purpose of such damages is to put [CBRE] in as good a position as it would have been if Jefferson . . . had 'performed as promised.'" "Some jurors feel the above passage refers to what CBRE would have received (netted) had Jefferson . . . not breached [and] the deal had gone forward successfully — this would have equaled 3% of the covenant sale. Others feel this refers to the 6% caused by the breach as stated in the listing agreement." The court informed the jury that this was a factual, not legal, question. In another question, the jury wrote: "The jury is currently divided concerning the amount of damages as per question 6 [on the special verdict form]. We would like to know which takes priority — the attached instruction . . . or the listing agreement." The court responded in part with the observation that there was "no inconsistency between these instructions and the listing agreement." In another question, the jury wrote: "In determining harm, are we to include court costs, attorney fees, arbitration costs, loss of interest, all misc. costs. Specifically, we do not know the exact amount of costs — can we state just the above [and] not exact amounts. Are there judge instructions on this." The court responded, "No. In determining whether [CBRE] was harmed (Question #5) and the amount of those damages (Question #6), you are not to consider court costs, attorney's fees, arbitration costs, or interest."

22

Based on all the foregoing circumstances, we conclude damages were unliquidated and uncertain.  CBRE was not entitled to prejudgment interest under Civil Code section 3287, subdivision (a).

## DISPOSITION

The postjudgment order denying CBRE's motion for attorney fees is reversed and the matter is remanded for a new hearing as to the amount of attorney fees. The judgment and accompanying postjudgment order denying recovery of prejudgment interest are affirmed.  CBRE shall recover costs incurred on appeal, as it prevailed on almost all of the issues raised.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

ARONSON, J.

23