Filed 2/3/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| PAINTCARE et al., | B251351 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS140176) |
| v. | |
| CAROLL MORTENSEN etc. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Greenberg Traurig, Gene Livingston, Monica J. Baumann; Greenberg Traurig and Scott D. Bertzyk for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Gary E. Tavetian and Daniel M. Lucas, Deputy Attorneys General, for Respondents.

_____

## INTRODUCTION

PaintCare and American Coatings Association appeal from a judgment denying their petition for a writ of mandate, entered in favor of the California Department of Resources Recycling and Recovery and its director, Caroll Mortensen (collectively CalRecycle). By their petition, PaintCare and American Coatings Association sought to invalidate regulations adopted by CalRecycle to implement and enforce the Architectural Paint Recovery Program (Program) (Pub. Resources Code, § 48700 et seq.; see Cal. Code Regs., tit. 14, §§ 18950-18958[1]). They contend that CalRecycle did not have the authority to adopt regulations to implement and enforce the Program and, even if it had the authority, the regulations improperly enlarge the scope of the Program by setting requirements for manufacturers that go beyond the Program.

As we discuss below, CalRecycle had authority to adopt the regulations. Further, the regulations do not go beyond the Program because they do not dictate *how* manufacturers comply with the Program. Rather, they set forth *what* information manufacturers must provide to CalRecycle to comply with the Program. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Waste Management Act*

In 1989, the Legislature enacted the California Integrated Waste Management Act (Waste Management Act) to establish a statewide "comprehensive program for solid waste management." (Pub. Resources Code, § 40002; see *Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 305.) The goal of the Waste Management Act is "'to reduce, recycle, and reuse solid waste generated in the state to the maximum extent feasible in an efficient and cost-effective manner . . . .'" (*Waste*

---

[1] All further references to title 14 of the California Code of Regulations will be to "14 CCR" or "regulations."

*Resource Technologies*, *supra*, at p. 305.)  In order to accomplish this goal, "the purview of the Waste Management Act is indeed broad . . . ."  (*Ibid.*)

The Waste Management Act established the Integrated Waste Management Board, now CalRecycle,[2] to implement the act.  (Pub. Resources Code, §§ 40400-40511.)  The Waste Management Act gives CalRecycle responsibility for developing and implementing programs aimed at reducing, recycling, and composting different types of solid waste, including "'metallic discards' ([*id.*], §§ 42160-42165), a variety of paper products ([*id.*], §§ 42200-42222, 42550-42563, 42750-42791), composted materials ([*id.*], §§ 42230-42247), plastics ([*id.*], §§ 42300-42380), retreaded tires ([*id.*], §§ 42400-42416), lead-acid and household batteries ([*id.*], §§ 42440-42450), household hazardous waste ([*id.*], §§ 47000-47550), and oil ([*id.*], §§ 48600-48691)."  (*Waste Resource Technologies v. Department of Public Health*, *supra*, 23 Cal.App.4th at p. 305.)  The Waste Management Act provides that CalRecycle "shall adopt rules and regulations, as necessary, to carry out this division . . . ."  (Pub. Resources Code, § 40502, subd. (a).)

## B.  *The Architectural Paint Recovery Program*

In 2010, the Legislature passed Assembly Bill 1343 (AB 1343), which created the Program (Pub. Resources Code, §§ 48700-48706).  In enacting AB 1343, the Legislature found that latex and oil-based architectural paints[3] were "convenient to buy and inconvenient to recycle or legally dispose of in California."  (Stats. 2010, ch. 420, § 1(f).)  Leftover architectural paint comprised approximately 35 percent of products collected at publicly-operated hazardous waste collection facilities, the highest volume of all products collected, and its disposal constituted the largest cost to local governments in

---

[2]     The Integrated Waste Management Board was renamed the Department of Resources Recycling and Recovery in 2009 and is commonly referred to as "CalRecycle."  (Stats. 2009, ch. 21, § 9.)

[3]     "'Architectural Paint'" includes "interior and exterior architectural coatings, sold in containers of five gallons or less for commercial or homeowner use . . . ."  (Pub. Resources Code, § 48701, subd. (a).)

3

management of household hazardous waste. (*Ibid*.) The purpose of the Program was "to require paint manufacturers to develop and implement a program to collect, transport, and process postconsumer paint to reduce the costs and environmental impacts of the disposal of postconsumer paint in this state." (Pub. Resources Code, § 48700.)

Manufacturers of architectural paints sold in California must prepare and implement "paint stewardship plans" (Plans), individually or through a stewardship organization,[4] designed to "implement a recovery program to reduce the generation of postconsumer architectural paint, promote the reuse of postconsumer architectural paint, and manage the end-of-life of postconsumer architectural paint, in an environmentally sound fashion, including collection, transportation, processing, and disposal." (Pub. Resources Code, § 48702, subd. (a).) Manufacturers must submit the Plans to CalRecycle (*ibid.*) and annually report on their progress to CalRecycle (*id*., § 48705).

The Plans must also demonstrate sufficient funding for the stewardship program described in the Plans through a fee charged to consumers for each container of architectural paint sold in California. (Pub. Resources Code, § 48703, subds. (b)(1), (2) & (3).) The Plans must address coordination of the stewardship program with existing local household hazardous waste collection programs. (*Id*., § 48703, subd. (c).) Finally, the Plans "shall include consumer, contractor, and retailer education and outreach efforts to promote the source reduction and recycling of architectural paint. . . ." (*Id*., § 48703, subd. (e).)

The Program prohibits manufacturers from selling paint in California unless they comply with the requirements of the Program. (Pub. Resources Code, § 48702, subd. (b).) The Program provides that CalRecycle "shall review the plan within 90 days of receipt, and make a determination whether or not to approve the plan." (*Id*., § 48704, subd. (a).) CalRecycle "shall" approve the Plan if it provides for a stewardship program

---

[4] A "'[s]tewardship organization' means a nonprofit organization created by the manufacturers to implement the architectural paint stewardship program described in Section 48703." (Pub. Resources Code, § 48701, subd. (h).)

that meets the requirements of section 48703. (*Id*., § 48704, subd. (a).) Thereafter, the Program requires CalRecycle to review and approve annual reports and adopt a finding of compliance or noncompliance with the Program. (*Id*., § 48705, subd. (b).)

The Program requires CalRecycle to post on its website the names of manufacturers that have submitted compliant annual reports. (Pub. Resources Code, § 48702, subd. (c).) The Program also provides that the Plans shall be public records. (*Id*., § 48704, subd. (b)(1).) CalRecycle "shall enforce" the program and has authority to impose civil penalties. (*Id*., § 48704, subds. (d), (f).) The Program also directs CalRecycle to impose and collect a fee on stewardship organizations to cover the full cost of administering and enforcing the program. (*Id*., § 48704, subd. (e).)

## C. *The Regulations Adopted by CalRecycle*

In early 2011, CalRecycle began the process of drafting regulations to implement the Program. Over a period of more than 13 months, CalRecycle drafted proposed regulations, received public comments, and held hearings on the proposed regulations. On May 14, 2012, CalRecycle adopted regulations, specifically sections 18950 through 18958, "to clarify existing statute [the Program] and establish administrative procedures to efficiently and effectively implement [CalRecycle's] responsibilities under the law and to provide a uniform competitive business environment to all architectural paint manufacturers pursuant to § 48700 of the Public Resources Code." (14 CCR, § 18950.) The regulations became effective June 6, 2012. (Cal. Reg. Notice Register 2012, No. 24-Z, p. 801.)

### 1. *Paint Stewardship Plans*

The regulations specify what the Plans must contain. (14 CCR, § 18953, subd. (a).) The Plans must set forth "program goals," including a baseline from which the goals will be measured and a description of and methodology for how the goals will be measured. (*Id*., § 18953, subd. (a)(2).) The Plans must also describe the system that will be used to collect and manage postconsumer architectural paint by paint type;

5

specify destinations for reuse, processing and/or disposal by paint type; set forth best management practices to be followed at collection sites; and describe how individual consumers will be able to recycle and manage their unwanted paint, including information on collection points located in the state. (*Id*., § 18953, subd. (a)(3).)

The Plans also must provide "a description of education and outreach efforts to consumers, contractors, and retailers to promote source reduction and recycling of architectural paint," including how the outreach and education methods will be used and distributed. (14 CCR, § 18953, subd. (a)(5).)

2. *Annual Reports*

The regulations also specify what information the annual reports must contain. (14 CCR, § 18954, subd. (a).) The annual reports must include a description of the stewardship program, including "the methods used to collect, transport, and process postconsumer architectural paint, by type, in California," and "how each consumer of architectural paint in California had an opportunity to recycle and properly manage their postconsumer paint . . . ." (*Id*., § 18954, subd. (a)(3)(A) & (B).) The annual reports must also state the "goals from the approved stewardship plan, the baseline from which goals were measured, and report on achievement during the reporting period." (*Id*., § 18954, subd. (a)(4).) In addition, the annual report must discuss "the total cost of implementing the architectural paint stewardship program and an evaluation of how the program's funding mechanism operated, including whether or not the funding was sufficient to recover, but not exceed, the administrative, operational, and capital costs of the manufacturer or stewardship organization's program." (*Id*., § 18954, subd. (a)(5).)

3. *Civil Penalties*

The regulations specify the civil penalties that may be imposed for failure to comply with the Program or regulations. (14 CCR, §§ 18955-18955.3.) The regulations include penalty tables listing the severity of different violations of the Program and regulations and the amount of fines that may be imposed for violations at each severity

6

level.  (*Id.*, § 18955.1.)  They also list the factors CalRecycle "shall" consider in assessing civil penalties.  (*Id.*, § 18955.2.)

4.  *Recordkeeping Requirements and Fees*

The regulations contain recordkeeping requirements for manufacturers, stewardship organizations and retailers subject to the Program.  (14 CCR, § 18956.) Finally, the regulations provide for CalRecycle to approve the annual administrative fee described in Public Resources Code section 48704, subdivision (e), and set a procedure and basis for setting the administrative fee to be paid by manufacturers and stewardship organizations.  (14 CCR, § 18958, subds. (a), (c).)

**D.  *The Mandate Proceedings***

American Coatings Association is a voluntary, nonprofit trade association of paint and coatings manufacturers, and it is the sole owner of PaintCare, a nonprofit paint stewardship organization (collectively, "PaintCare").  PaintCare filed this action on October 30, 2012, seeking a writ of mandate vacating the regulations and ordering CalRecycle to cease implementing and enforcing the regulations.  PaintCare claimed that the regulations were invalid because CalRecycle lacked authority to adopt them; they were inconsistent with and exceeded the scope of the Program; and they were not "reasonably necessary" to effectuate the purpose of the Program.

The trial court denied the petition.  After setting forth the standard of review and governing law, the trial court analyzed PaintCare's claims.  It noted that CalRecycle had the "authority to promulgate regulations which enable it to ascertain whether manufacturers are following the Program."  Further, it held that this "gap-filling authority is dispositive of all the issues in this case" and that the regulations were "necessary to 'fill up the details' of the statutory scheme."  The court agreed with CalRecycle that "'[t]o hold . . . that administrative regulations are valid only when a statutory provision directly calls for regulation would be to eliminate any role for agency discretion and is contrary to law.'"

7

## DISCUSSION

### A. *Standard of Review*

Where, as here, a party challenges a regulation under Government Code section 11342.2[5] on the ground that it is in conflict with the governing statute or exceeds the lawmaking authority delegated by the Legislature, "the issue of statutory construction is a question of law on which a court exercises independent judgment." (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415-416 (*Western States*) [applying independent judgment standard to resolve challenge to regulation treating real property and improvements at refinery as one appraisal unit for valuation under Propositions 13 and 8 where challenge based on asserted inconsistencies with statutes]; accord, *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 (*Yamaha*) ["[a] court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature"].)

As our Supreme Court held in *Western States*, "'Because agencies granted such substantive rulemaking power are truly "making law," their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.'" (*Western States*, *supra*, 57 Cal.4th at pp. 415-416, quoting *Yamaha*, *supra*, 19 Cal.4th at pp. 10-11.)

CalRecycle urges us to adopt a "deferential standard" to determine "whether the agency reasonably interpreted the legislative mandate," citing *Yamaha*, *supra*, 19 Cal.4th

---

[5]  Government Code section 11342.2 provides: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute."

8

at pages 10-11 and *Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651, 657.  In *Yamaha*, the Supreme Court considered the standard to apply in reviewing an agency's interpretation of the tax consequences of transactions under the Revenue and Taxation Code, finding that the weight the agency's interpretation should be given is "*situational*," depending on a number of factors, including the technical expertise and knowledge of the agency.  (*Yamaha*, *supra*, at p. 12.)  However, the question of an agency's interpretation of a statute is different from the issue here of whether regulations fall within the scope of the agency's authority, for which the Supreme Court in *Yamaha* found the court does not defer to the agency's view.[6]  (*Id*. at pp. 10-11.)

In *Payne*, also relied upon by CalRecycle, the Supreme Court applied a deferential standard of review where the question was whether the challenged regulations were "'necessary'" to carry out the statutory provisions relating to credit insurance.  (*Credit Ins. Gen. Agents Assn. v. Payne*, *supra*, 16 Cal.3d at p. 657.)  This question of necessity is the second prong of the analysis under Government Code section 11342.2, which provides that implementing regulations must be "reasonably necessary to effectuate the purpose of the statute."  When a regulation is challenged on this basis, "our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis."  (*Western States*, *supra*, 57 Cal.4th at p. 415, citing *Yamaha*, *supra*, 19 Cal.4th at p. 11 & fn. 4.)

PaintCare does not argue that the CalRecycle regulations are not "reasonably necessary" to effectuate the purpose of the Program, and thus this deferential standard does not apply.  (See *Nortel Networks Inc. v. Board of Equalization* (2011) 191 Cal.App.4th 1259, 1277 ["[t]he agency's view is given no deference when a court decides

---

[6]    As the concurring opinion in *Yamaha* similarly noted, "the first prong of the inquiry—whether the regulation is 'within the scope of the authority conferred'—is *not* limited to the 'arbitrary and capricious' standard of review, but employs the independent judgment/great weight standard."  (*Yamaha*, *supra*, 19 Cal.4th at p. 17, fn. 2 (conc. opn. of Mosk, J.), citing *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11; *Morris v. Williams* (1967) 67 Cal.2d 733, 748-749.)

whether a regulation lies within the scope of the agency's authority"].)[7]  Accordingly, we review the validity of the CalRecycle regulations de novo, and we are not bound by the trial court's interpretation of the regulations or authorizing statutes.  (See, e.g., *Western States*, *supra*, 57 Cal.4th at pp. 416-421 [analyzing consistency of regulation with statutory law without giving deference to agency interpretation]; accord, *California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 54 ["'[a]s the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court's interpretation'"].)[8]

## B. *CalRecycle's Regulations Are a Valid Exercise of its Rulemaking Authority Under the Program*

PaintCare argues both that CalRecycle did not have the authority to adopt regulations implementing the Program and, further, that even if it did have authority to adopt regulations, the regulations at issue here improperly enlarged the scope of the Program by imposing additional requirements on manufacturers not found in the statute. We address these arguments in turn.

---

[7]     CalRecycle also cites to *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 469, to argue that we should give great weight to its interpretation of the Program.  *American Coatings* involved a challenge to an air quality agency's interpretation of the term "'best available retrofit control technologies'" as used in the air quality statute to include technologies that are not yet available but are expected to be available in the future.  (*Ibid*.)  The court upheld the regulations, giving weight to the agency's construction of the statute because the ""'legal text to be interpreted is technical, . . . complex, open-ended, [and] entwined with issues of fact, policy, and discretion."'"  (*Ibid*., quoting *Yamaha*, *supra*, 19 Cal.4th at p. 12.) PaintCare's challenge here is not to CalRecycle's interpretation of technical statutory language.

[8]     Because we review the statutes and regulations themselves, not the trial court's ruling, we need not address PaintCare's challenges to the trial court's reasoning or the authority on which it relied in reaching its decision.

10

1.  *The Legislature Delegated to CalRecycle Authority To Adopt Regulations*
    *To Implement the Program*

An administrative agency "has only as much rulemaking power as is invested in it by statute."  (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299; *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 391.)  Regulations that are inconsistent with a statute, alter or amend it, or enlarge or impair its scope are void.  (*Carmel Valley Fire Protection Dist.*, *supra*, at p. 300; *Association for Retarded Citizens*, *supra*, at p. 391.)

      a.  The plain language of Public Resources Code section 40502,
          subdivision (a), supports a finding that CalRecycle has authority
          to adopt regulations.

In determining whether the Legislature has authorized CalRecycle to exercise its rulemaking power to implement the Program, "we first '"scrutinize the actual words of the statute, giving them a plain and commonsense meaning."'  [Citation.]"  (*Gomez v. Superior Court* (2012) 54 Cal.4th 293, 300; accord, *People v. McGraw-Hill Companies, Inc.* (2014) 228 Cal.App.4th 1382, 1388.)  Where the court interprets different portions of a statute, the court considers the sections "'"in the context of the entire statute and the statutory scheme of which it is a part . . . .'"  (*McGraw-Hill Companies, Inc.*, *supra*, at pp. 1388-1389 [interpreting two subdivisions of anti-SLAPP statute in light of overall statutory scheme], quoting *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063; *CB Richard Ellis, Inc. v. Terra Nostra Consultants* (2014) 230 Cal.App.4th 405, 414 [interpreting statute setting time frame for dissolution of limited liability company in light of purpose of entire statutory scheme to prevent unjust enrichment of members of limited liability companies at expense of creditors].)

The Waste Management Act added Division 30 to the Public Resources Code.  (Stats. 1989, ch. 1095, § 22; Pub. Resources Code, § 40000 et seq.)  Chapter 3 of Part 1 of Division 30 establishes the powers of CalRecycle.  (Pub. Resources Code, § 40400 et seq.)  Section 40502, subdivision (a), of the Public Resources Code, also found in

11

Chapter 3 of Part 1 of Division 30, provides that CalRecycle "shall adopt rules and regulations, as necessary, to carry out *this division* . . . ." (Italics added.) The Program is found in Chapter 5 of Part 7 of Division 30. (*Id.*, § 48700 et seq.)

A plain reading of Public Resources Code section 40502, subdivision (a), in the context of Division 30, supports our finding that CalRecycle has the authority to adopt regulations, as necessary, to carry out all laws contained within Division 30 of the Waste Management Act, including the Program. (See, e.g., *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 356 [Vehicle Code section 1651's grant of authority to the Department of Motor Vehicles to adopt regulations authorized regulations to implement section 11713 of the Vehicle Code barring dissemination of false or misleading statements to the public]; *Credit Ins. Gen. Agents Assn. v. Payne*, *supra*, 16 Cal.3d at p. 656 [Insurance Code section 779.21's grant of authority to adopt regulations necessary to carry out the article provided broad discretion for insurance commissioner to adopt credit insurance regulations, including regulation limiting commission paid to credit insurance agents].)

Our reading of the Waste Management Act is consistent with Public Resources Code section 48704, subdivision (d), which provides that CalRecycle "shall enforce this chapter." The Program also allows CalReycle to collect fees to cover "program development costs or regulatory costs incurred by [CalRecycle] prior to the submittal of the stewardship plans." (*Id.*, § 48704, subd. (e)(2).) This section evinces a legislative intent that CalRecycle adopt regulations to implement the Program—absent its promulgation of regulations, CalReycle would only incur regulatory costs after submittal of the Plans.

 b. CalRecycle has authority to "fill up the details" of the Program through adoption of regulations.

The lack of specific language in the Program itself authorizing CalRecycle to adopt regulations does not negate the authority set forth in Public Resources Code section 40502, subdivision (a). "An administrative agency is not limited to the exact provisions

12

of a statute in adopting regulations to enforce its mandate. '[The] absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority . . . .' [Citations.] The [administrative agency] is authorized to '"fill up the details"' of the statutory scheme. [Citation.]" (*Ford Dealers Assn. v. Department of Motor Vehicles*, *supra*, 32 Cal.3d at p. 362 [finding the Department of Motor Vehicles had authority to adopt regulations setting specific limits on advertising and sales by car dealers to "'"fill up the details"'" of the statutory scheme prohibiting dissemination of false or misleading statements to public, even though Vehicle Code section 11713 was silent as to rulemaking authority]; accord, *California School Bds. Assn. v. State Bd. of Education* (2011) 191 Cal.App.4th 530, 544 [upholding validity of regulations adopted by Board of Education interpreting Charter Schools Act, finding rules within authority of Board to "fill up the details" of the statutory scheme]; *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 171, 174 [finding city's tax collector could "'"'fill up the details'"'" of the hotel tax by adopting guidelines requiring hotel operators to apply hotel tax to parking charges for hotel guests]); *Masonite Corp. v. County of Mendocino Air Quality Management Dist.* (1996) 42 Cal.App.4th 436, 445-447 [finding Board properly acted to "fill up the details" of an air quality statute by defining statutory provision for "data used to calculate emissions" to include "emissions factors," which were therefore protected as trade secrets]; see also *Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1205-1206 [finding Department of Fish and Game had authority to solicit and use private funds to have contractor prepare a draft master plan as part of implementation of Marine Life Protection Act].)

In *Ford Dealers Assn.*, our Supreme Court considered a challenge to five regulations adopted by the Department of Motor Vehicles (DMV) to implement Vehicle Code section 11713, subdivision (a), barring the dissemination of false or misleading statements to the public. The court held that the regulations were a valid exercise of the DMV's regulatory authority under section 1651 of the Vehicle Code. (*Ford Dealers Assn. v. Department of Motor Vehicles*, *supra*, 32 Cal.3d at p. 354.) Vehicle Code

13

section 1651, similar to Public Resources Code section 40502, subdivision (a), at issue here, is found in Division 2 of the Vehicle Code, setting forth the "Powers and Duties" of the DMV, and generally authorizes "the director of the DMV to adopt rules and regulations 'as may be necessary to carry out the provisions' of the Vehicle Code." Vehicle Code section 11713, enacted as part of the "Occupational Licensing and Business Regulations," is found in Division 5 of the Vehicle Code, and, like the Program at issue here, has no separate authorizing language.

The court held that under Vehicle Code section 1651, the DMV was authorized to "'fill up the details'" of the Occupational Licensing and Business Regulations statute, barring a specific class of misleading statements, including prohibiting certain dealer added charges on sales and requiring disclosure of a vehicle's prior history as a rental vehicle. (*Ford Dealers Assn. v. Department of Motor Vehicles*, *supra*, 32 Cal.3d at pp. 362-365.)

c. The Legislature's grant of rulemaking authority for other programs in the Waste Management Act does not mean the Legislature intended not to grant CalRecycle rulemaking authority as to the Program.

PaintCare argues that to find that CalRecycle had "gap-filling authority" as to the Program on the basis of Public Resources Code section 40502, subdivision (a), would render language in the Waste Management Act granting rulemaking authority as to other statutes within the Waste Management Act mere surplusage, contrary to rules of statutory construction, citing to *Klein v. United States of America* (2010) 50 Cal.4th 68, 80 ["courts must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous"].

PaintCare cites examples of the Legislature's express grant of regulation-making authority in the Waste Management Act,[9] including Public Resources Code sections 42297, subdivision (a) [CalRecycle "may adopt such regulations as it determines are necessary" to implement the chapter on plastic bags]; 42475, subdivision (b) [CalRecycle "may adopt regulations" to implement the Electronic Waste Recycling Act of 2003]; 42881, subdivision (a) [CalRecycle "may adopt any rules or regulations which [it] determines may be necessary or useful to carry out" the California Tire Recycling Act]; and 48641 [CalRecycle "may adopt any other rules and regulations . . . which [it] determines may be necessary or useful to carry out" the California Oil Recycling Enhancement Act].)

PaintCare contrasts these programs with those in the Waste Management Act in which the Legislature did not specify that CalRecycle had the authority to adopt implementing regulations, including the Rechargeable Battery Recycling Act of 2006 (Pub. Resources Code, § 42451 et seq.); the Cell Phone Recycling Act of 2004 (*id*., § 42490 et seq.); the Product Stewardship for Carpets program (*id*., § 42970 et seq.); and the Home-generated Sharps Waste Collection program (*id*., § 47115 et seq.). Of these four, only the Product Stewardship for Carpets program has implementing regulations, which are similar to those adopted for the Program. (14 CCR, §§ 18940-18948.)

The flaw in this argument is that the same rule of construction equally supports the opposite conclusion—if the Legislature intended only to allow agency rulemaking as to specified programs within the Waste Management Act, this would render Public Resources Code section 40502, subdivision (a)'s broad mandate that CalRecycle adopt regulations superfluous.[10] We find instead that the unambiguous language of section

---

[9] The Waste Management Act refers to the adoption of regulations by the Integrated Waste Management Board or the Department of Resources Recycling and Recovery, now CalRecycle.

[10] PaintCare also relies on a statement in Justice Mosk's concurring opinion in *Yamaha*, *supra*, 19 Cal.4th at p. 18, that "when the agency is called upon to enforce a detailed statutory scheme, discretion is as a rule correspondingly narrower." But as we

15

40502, subdivision (a), must be interpreted by applying its plain meaning, that CalRecycle is authorized to adopt rules and regulations, as necessary to carry out individual programs within the Waste Management Act, including the Program.[11]

2. *The Regulations' Requirements for Plans Do Not Enlarge or Impair the Scope of the Program*

PaintCare contends that CalRecycle's regulations enlarge the scope of the Program by setting requirements for manufacturers to follow that go beyond what the Program requires. Specifically, PaintCare argues that the regulations improperly set requirements for how they are to reduce the generation of postconsumer paint, promote its reuse, and properly prepare for its end-of-life management. However, a careful review of the regulations reveals that manufacturers are still free to decide *how* they intend to comply with the Program's requirements; the regulations require that manufacturers disclose in their Plans *what* they are going to do to achieve these objectives.

We next turn to each of the challenged provisions contained in 14 CCR sections 18953 through 18955.1. As we find below, the regulations properly "fill up the details" of the Program to specify the criteria CalRecycle will apply in its review of Plans and

---

discuss below, the Program is not a detailed statutory scheme. To the contrary, it provides very little detail on what should be included in a Plan or annual report, making adoption of regulations critical to enforcement of the Program.

[11] PaintCare also cites to a letter to CalRecycle by Jared Huffman, AB 1343's author, as evidence that the Legislature did not intend for CalRecyle to adopt regulations to implement the Program but intended that all responsibility for implementing the Program be placed on manufacturers and paint stewardship organizations. As CalRecycle points out, while the legislative history of a statute may be a legitimate aid in interpreting a statute, "'the statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation.' [Citation.]" (*In re Greg F*. (2012) 55 Cal.4th 393, 419, fn. 5; accord, *People v. Cruz* (1996) 13 Cal.4th 764, 780, fn. 9 ["[w]e do not rely . . . on evidence of the individual views of proponents of legislation"].)

16

annual reports as part of its responsibility to enforce compliance with the Program, and thus are fully within the rulemaking authority vested in CalRecycle. (See *Ford Dealers Assn. v. Department of Motor Vehicles*, *supra*, 32 Cal.3d at p. 362; *Batt v. City and County of San Francisco*, *supra*, 184 Cal.App.4th at p. 171.)

> a. The regulatory provisions for setting goals for Plans are consistent with Public Resources Code section 48703, subdivision (d).

PaintCare points to section 18953, subdivision (a)(2), of the regulations, which sets forth information that needs to be included in Plans as to "program goals," as the most "egregious" example of the regulations expanding the scope of the requirements of the Program. Public Resources Code section 48703, subdivision (d), provides that a Plan "shall include goals established by the manufacturer or stewardship organization to reduce the generation of postconsumer paint, to promote the reuse of postconsumer paint, and for the proper end-of-life management of postconsumer paint . . . ." To implement this statutory provision, 14 CCR section 18953, subdivision (a)(2), provides:

"Program Goals and Activities. . . . Description of goals must include a baseline, to be provided by the manufacturer or stewardship organization, from which the goals will be measured and reported in the manufacturer or stewardship organization's annual reports. The baseline should indicate the status of household hazardous waste management in California at the time of plan submission. Describe how the goals will be measured, including a description of the methodology used for estimating the amount of leftover paint available for collection in California."

PaintCare argues that by requiring the Plans to include a baseline from which the goals will be measured and dictating how to calculate the baseline, CalRecycle is imposing specific program goals on the manufacturer. To the contrary, nowhere do the regulations require manufacturers to set a specific goal, for example, a defined percentage increase in collection of leftover postconsumer paint. Under the Program, manufacturers can set their own goals for reducing postconsumer paint, but the Program does not specify how manufacturers are to measure goals for inclusion in their Plans. CalRecycle

17

has "filled up the details" by clarifying that the manufacturer should calculate a baseline of the current status of household hazardous waste management at the time the Plan is submitted, then set a goal based on a change in this baseline level. (14 CCR, § 18953, subd. (a)(2).)

PaintCare also contends that the requirement that Plans describe the methodology used for estimating the amount of leftover paint improperly expands the scope of the Program, which is silent as to the choice of methodology.[12]  As with the requirement that Plans include a baseline to measure goals, the regulations do not require manufacturers to use a particular methodology, but instead allow them to choose the methodology that will best enable them to measure their goals.  This too is within CalRecycle's authority to "fill up the details."

PaintCare next argues that the Program allows a manufacturer to raise or lower its goals every year based on data collected for the annual report (Pub. Resources Code, § 48703, subd. (d)), but the regulations lock the manufacturers into meeting the goals they initially set in the Plan.  However, the regulations in no way limit the ability of manufacturers to modify their goals based on data collected in a given year.  Rather, the regulations only require that the annual report contain information on progress during the preceding year in achieving the manufacturer's goals. (14 CCR, § 18954, subd. (a)(4).)[13]

---

[12]     CalRecycle asserts that PaintCare failed to raise this claim in the trial court and it therefore has been forfeited on appeal.  PaintCare counters that they have "consistently argued that **all** additional requirements for manufacturer plans beyond what are specified in [the Program] are improper."  While the failure to raise a claim in the trial court generally results in forfeiture of that claim on appeal, where the claim "presents a pure question of law," we may address the claim on appeal. (*City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1503; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1373, fn. 8.)  Because PaintCare's challenge to the methodology requirement raises a question of law, we will address it here.

[13]     PaintCare also argues that the regulations expand the Program by requiring that the baseline be based on the status of household hazardous waste management, whereas Public Resources Code section 48703, subdivision (d), only requires that the goals be based on household hazardous waste management information "as practical."  However,

Requiring manufacturers in their Plans to set goals to reduce generation, promote reuse, and provide for management of postconsumer paint, and to describe how they will achieve these goals, is consistent with the purpose of the Program "to require paint manufacturers to develop and implement a program to collect, transport, and process postconsumer paint to reduce the costs and environmental impacts of the disposal of postconsumer paint in this state." (Pub. Resources Code, § 48700.) Further, absent guidelines on how to measure a manufacturer's progress toward these goals, CalRecycle would have no way of evaluating a manufacturer's paint recovery efforts under the Plan, in order to carry out its responsibilities to enforce the Program (Pub. Resources Code, § 48704, subd. (d)), approve Plans (*id.*, § 48704, subd. (a)), and approve the annual reports (*id.*, § 48705, subd. (b)).

     b.  The regulatory provisions governing collection of postconsumer paint are consistent with Public Resources Code sections 48702, subdivision (a), and 48703, subdivision (d).

Subdivision (a)(3) of section 18953 of the regulations requires paint manufacturers to describe the system they will use to collect and manage postconsumer paint, including collection methods for paint "by type"; to specify destinations for reuse, processing and disposal; to describe best management practices for collection points; and to describe how consumers will be able to recycle and manage postconsumer paint, including setting forth the proposed number, location, and type of collection points in the state. PaintCare argues that the regulations enlarge the scope of the Program because the Program does not refer to collection methods, separate manufacturers' obligations by type of paint,

this is a misreading of section 48703, subdivision (d), which requires that "[t]he plan shall include goals established by the manufacturer or stewardship organization to reduce the generation of post consumer paint . . . including recovery and recycling of postconsumer paint, as practical, based on current household hazardous waste program information." Contrary to PaintCare's argument, the "as practical" clause modifies the prior phrase, that the goals should include "recovery and recycling of postconsumer paint, as practical."

require specification of best management practices, or require that manufacturers work to ensure the ability of consumers to recycle or reuse paints.

              i. *Requirements to disclose collection methods fall within the Program's scope.*

While the Program does not contain specific requirements for paint collection systems, the Program does require that each manufacturer prepare and implement a Plan "to develop and implement a recovery program to reduce the generation of postconsumer architectural paint, promote the reuse of postconsumer architectural paint, and manage the end-of-life of postconsumer architectural paint, in an environmentally sound fashion, including the collection, transportation, processing, and disposal." (Pub. Resources Code, § 48702, subd. (a).)

Thus, the Program envisions that each Plan will address the "collection, transportation, processing, and disposal" of postconsumer paint and that the manufacturer will develop and implement a "recovery program" to meet the goals of reduction and reuse of postconsumer paint. CalRecycle has "filled up the details" to clarify the criteria for evaluation of manufacturer Plans.

For example, the regulations require that the Plans disclose the destination for reuse, recycling and/or disposal for paints. (14 CCR, § 18953, subd. (a)(3)(B).) This is consistent with the language that the Plans address the "collection, transportation, processing, and disposal" of postconsumer paints. Contrary to PaintCare's assertion, the regulations do not specify how the collection must be done or where the collection points need to be—only that this information be provided in the Plans. As PaintCare recognizes in its reply brief, it is the public nature of the plans that provides the incentive for manufacturers to provide an adequate program. But it is the responsibility of CalRecycle in enforcing the Program to ensure that Plans contain sufficient information regarding the recovery program.

20

ii. *Requirements to make disclosures "by type" of paint fall within the Program's scope.*

PaintCare contends that the regulations impermissibly require them to describe collection methods used for architectural paint "by type" (14 CCR, § 18953, subd. (a)(3)(A)) and destinations for reuse, processing and/or disposal for architectural paints "by type" (*id.*, § 18953, subd. (a)(3)(B)), whereas the Program does not contain separate provisions for different types of paint.

PaintCare points out that in enacting the Program, the Legislature found both latex and oil-based architectural paints to be hazardous (Stats. 2010, ch. 420, § 1). PaintCare also cites to Health and Safety Code sections 25217 through 25217.4, addressing recyclable latex and oil-based paint, claiming that Health and Safety Code sections 25217.2 and 25217.2.1 "provide for both latex and oil based paints to be managed identically." This is not a correct reading of the statutes. Health and Safety Code section 25217.2 sets forth the conditions under which "[r]ecyclable latex paint may be accepted at any location including, but not limited to, a permanent household hazardous waste collection facility . . . ." (*Id.*, § 25217.2, subd. (a).) Health and Safety Code section 25217.2.1, subdivision (a), provides that "[a] location that accepts recyclable latex paint pursuant to Section 25217.2 may also accept oil-based paint *if all of the additional [specified] conditions are met*." (Italics added.)

By these provisions, the Legislature has explicitly recognized that there are different requirements for recycling and disposal of different types of paint. Accordingly, tailoring collection plans and disposal destinations to the types of paint to be collected is consistent with the Program's goal to achieve reductions in postconsumer paint. In addition, as argued by CalRecycle, information on collection of paints by type is necessary for the calculation of costs of collection and reuse or recycling of the paints, which costs are to be assessed on individual cans of paint. (Pub. Resources Code, § 48703, subd. (b)(3).) Information on potentially differing costs of collection of latex and oil-based paints is necessary to ensure that the assessments imposed on containers of

paint are "sufficient to recover, but not exceed, the cost of the architectural paint stewardship program."  (*Ibid*., § 48703, subd. (b)(4).)

> iii. *Requirements that Plans disclose "best management practices" to be used at collection sites and "any training" to be provided fall within the Program's scope.*

For the same reasons we discussed above, CalRecycle properly "filled in the details" as to best management practices to be used and "any training" the manufacturer will provide to ensure proper collection and management of postconsumer paint. Nothing in these provisions mandates that a particular best management practice be implemented or that a specific type of training be provided, but rather, that the manufacturer decide these issues, and disclose them in the Plans.  (14 CCR, § 18953, subd. (a)(3)(C).)

> iv. *Requirements that Plans disclose how consumers can recycle and manage unwanted paint, including listing available statewide collection sites, fall within the Program's scope.*

Section 18953, subdivision (a)(3)(D), of the regulations requires Plans to provide a description "of how each consumer of architectural paint in California will have an opportunity to recycle and properly manage their unwanted architectural paint on a state wide basis, including the proposed number, location, and type of collection points located in the state."  PaintCare argues that this portion of the regulation improperly adds a mandate that all consumers have an opportunity to recycle unused paint.  This portion of the regulation properly "fills up the details" of the Program by requiring disclosure of how the manufacturers' paint recovery programs will enable consumers to recycle or otherwise manage their unwanted postconsumer paints, including collection sites they will be able to use.  The provision does not mandate a specific number or location of collection sites, only that the Plans must disclose the number, location and types of collection sites in the state.  This is consistent with the purpose of the Program "to require

paint manufacturers to develop and implement a program to collect, transport, and process postconsumer paint . . . ." (Pub. Resources Code, § 48700.)

3. *The Regulations' Requirements for Annual Reports Do Not Enlarge or Impair the Scope of the Program*

The Program requires CalRecycle to review manufacturers' annual reports and to "adopt a finding of compliance or noncompliance with this chapter." (Pub. Resources Code, § 48705, subd. (b).) As we discuss below, the challenged regulations applicable to annual reports "fill up the details" of the Program by specifying information that must be included in the annual reports. Only with this information can CalRecycle carry out its responsibility to determine whether the annual reports are in compliance with the Program.

a. The regulatory provisions for annual reports contained in 14 CCR section 18954, subdivisions (a)(3) and (a)(4), are consistent with Public Resources Code section 48705, subdivision (a).

Public Resources Code section 48705, subdivision (a), requires manufacturers to submit annual reports describing their "architectural paint recovery efforts." This section provides: "At a minimum, the report shall include all of the following: [¶] (1) The total volume of architectural paint sold in this state during the preceding fiscal year. [¶] (2) The total volume of postconsumer architectural paint recovered in this state during the preceding fiscal year. [¶] (3) A description of methods used to collect, transport, and process postconsumer architectural paint in this state. [¶] (4) The total cost of implementing the architectural paint stewardship program. [¶] (5) An evaluation of how the architectural paint stewardship program's funding mechanism operated. [¶] (6) An independent financial audit funded from the paint stewardship assessment. [¶] [And] (7) Examples of educational materials that were provided to consumers the first year and any changes to those materials in subsequent years."

23

PaintCare contends that 14 CCR section 18954, entitled "Annual Report Compliance Criteria," improperly modifies and enlarges the statutory requirements for annual reports. These provisions are similar to those found in 14 CCR section 18953 applicable to Plans. Specifically, subdivision (a)(4) of section 18954 requires annual reports to "[s]tate goals from the approved stewardship plan, the baseline from which goals were measured, and report on achievement during the reporting period." Subdivision (a)(4) also requires information regarding the total volume of paint sold, by type, in the prior year and the volume of postconsumer paint collected, by type, during the preceding year.[14]

Subdivision (a)(3) of section 18954 of the regulations mirrors the requirements for Plans, including: "(A) A description of the methods used to collect, transport, and process postconsumer architectural paint, by type, in California. [¶] (B) Description of how each consumer of architectural paint in California had an opportunity to recycle and properly manage their postconsumer paint on a state wide basis, including the number, location, and type of collection points located in the state. [¶] [And] (C) Description of best management practices followed by service providers that are acting as collection points, which may include any training that the manufacturer or stewardship organization

---

[14]    Subdivision (a)(4) of section 18954 of the regulations requires an annual report to "[s]tate goals from the approved stewardship plan, the baseline from which goals were measured, and report on achievement during the reporting period. Describe any adjustments to goals stated in the approved stewardship plan that may be made for the upcoming reporting period and accompanying rationale for those changes. The annual report must include quantitative information and discussion on the following categories pursuant to [Public Resources Code section ]48705[, subdivision ](a), and [Public Resources Code section ]48703[, subdivision ](d): [¶] (A) The total volume of architectural paint sold, by type, in the state during the preceding reporting period. [¶] (B) The total volume of postconsumer architectural paint recovered, by type, in the state during the preceding reporting period. [¶] (C) Disposition of postconsumer paint collected, by type and by estimated volume, including name(s) and corporate address(es) for contracted processors for each."

24

provided or required of service providers to ensure proper collection and management of postconsumer paint."

For the same reasons we concluded that CalRecycle had authority to adopt 14 CCR section 18953, we find that CalRecycle was authorized to adopt 14 CCR section 18954 subdivisions (a)(3) and (a)(4). Moreover, the Legislature was clear in stating in Public Resources Code section 48705 that the annual report shall include seven specified items of information, "[a]t a minimum . . . ." (*Id*., § 48705, subd. (a).) It was well within CalRecycle's regulatory authority to delineate additional informational requirements to carry out the purposes of the Program.

> b. The regulatory provisions for reporting Program costs in annual reports contained in 14 CCR section 18954, subdivision (a)(5), are consistent with Public Resources Code section 48705, subdivision (a).

PaintCare contends that 14 CCR section 18954, subdivision (a)(5), constitutes "over-regulation" of cost reporting pursuant to Public Resources Code section 48705. That statutory provision provides that the annual report must include, at a minimum: "(4) The total cost of implementing the architectural paint stewardship program. [¶] (5) An evaluation of how the architectural paint stewardship program's funding mechanism operated. [¶] [And] (6) An independent financial audit funded from the paint stewardship assessment." (*Id*., § 48705, subd. (a)(4), (5), & (6).)

PaintCare challenges the requirement in CalRecycle's regulations that annual reports break down costs to include "(C) Capital costs[,] [¶] (D) Cost($)/capita[,] [¶] (E) Cost ($)/gallon collected[,] [¶] (F) Education/Outreach (% of total program cost)[, and] [¶] (G) End-of-life materials management (% of total program cost, with line items for reuse, transportation, recycling, fuel incineration, and proper disposal)." (14 CCR, § 18954, subd. (a)(5)(C)-(G).)

Given the Program's requirement that the annual report disclose the total cost of a manufacturer's recovery program, evaluate how the funding mechanism operated, and provide the results of an independent financial audit, the regulations provide guidance to

manufacturers as to what information needs to be provided to accomplish the requirements of Public Resources Code section 48705. PaintCare claims that some of the cost reporting calculations would impose an undue burden on manufacturers. However, they point to no evidence in the record that shows they would suffer an undue burden, nor do they explain why the regulation's requirements are any more onerous than those of the Program, which requires a full independent financial audit.

        c. The regulatory provisions for reporting educational and outreach activities in 14 CCR section 18954, subdivision (a)(6), are consistent with Public Resources Code section 48705, subdivision (a).

PaintCare raises the same claim of overreaching with respect to Public Resources Code section 48705, subdivision (a)(7), which requires manufacturers to include in their annual reports "[e]xamples of educational materials that were provided to consumers the first year and any changes to those materials in subsequent years." Section 18954, subdivision (a)(6), of the regulations requires the annual report to "[d]escribe educational and outreach activities in context of those identified in the stewardship plan. Provide a description of educational materials that were provided to retailers, consumers, and contractors during the reporting period and provide electronic examples of these materials. Identify any method(s) used to determine the effectiveness of educational and outreach efforts (e.g., surveys, hits on specific web pages, number of participants at events, etc.), if applicable. . . ." The regulation also contains a list of the types of "education and outreach materials" manufacturers may use, including signage, written materials, promotional materials and activities, and links to a stewardship website. (*Ibid*.)

PaintCare argues that the regulation goes beyond the scope of the Program by *requiring* that manufacturers provide educational materials to retailers and contractors (in addition to consumers), and incorporate methods for determining the materials' effectiveness into their programs in order to obtain approval of their annual reports. Again, PaintCare is blurring the lines between reporting obligations and mandates. Nothing in 14 CCR section 18954, subdivision (a)(6), requires that manufacturers

26

provide specific educational materials or implement certain methods to evaluate the effectiveness of their education programs. Indeed, as to the measurement of effectiveness, the regulation requires that the annual plan identify "any method(s)" used to determine the effectiveness of educational and outreach efforts. Further, the requirement that the annual reports describe educational materials provided to retailers, consumers, and contractors is consistent with the Program's requirement that the Plans "include consumer, contractor, and retailer education and outreach efforts." (Pub. Resources Code, § 48703, subd. (e).)

4. *The Regulations' Criteria for Imposition of Civil Penalties Do Not Enlarge or Impair the Scope of the Program*

Section 18955, subdivision (b), of the regulations provides that "[a] civil penalty may be administratively imposed by [CalRecycle] on any person who is in violation of any provision of this Article. The responsible party or parties shall be determined by [CalRecycle] based on the totality of the circumstances."[15] Section 18955.2 of the regulations sets forth the criteria to be considered in determining the amount of the civil penalty to be imposed.

PaintCare contends that CalRecycle exceeded its authority by adopting these regulations, which impose penalties for actions that do not violate the Program. Specifically, PaintCare argues that the Legislature intended that the principal enforcement mechanism to ensure compliance with the Program be the mandate in Public

---

[15] Section 18955.1, subdivision (b), of the regulations sets forth "Base Penalty Tables," with violations assigned one of three severity levels. It provides that "[f]or the purpose of implementing this Article, penalty severity levels are described as follows: [¶] (1) For a violation classified as Level 1, the amount of the base penalty may be up to $1,000 per day. [¶] (2) For a violation classified as Level 2, the amount of the base penalty may be up to $5,000 per day. [¶] (3) For a violation classified as Level 3, the amount of the base penalty may be up to $10,000 per day."

27

Resources Code section 48702, subdivision (b)(1), that a manufacturer or retailer cannot sell paint in California unless the manufacturer is in compliance with the Program.

This argument ignores Public Resources Code section 48704, subdivision (f), which provides that CalRecycle may administratively impose a civil penalty of up to $1,000 on any person "who violates this chapter" and up to $10,000 per day for intentional, knowing, or negligent violations. Each of the eight violations listed in 14 CCR section 18955.1 constitutes a violation of "this chapter," i.e., the Program or the regulations implementing the Program: (1) selling paint not covered by an approved Plan or listed as a compliant product (Pub. Resources Code, § 48702, subd. (b)(1)); (2) failure to submit a Plan (*id*., §§ 48702, subd. (a), 48703, subd. (a)); (3) failure to resubmit a Plan after disapproval (14 CCR, § 18952, subd. (b)(3)); (4) failure to implement a paint stewardship program described in a Plan (Pub. Resources Code, § 48704, subd. (c)); (5) failure to pay the annual administration fee (*id*., § 48704, subd. (e)); (6) failure to submit an annual report (*id*., § 48705, subd. (a)); (7) failure to include required elements in an annual report (*ibid*.); and (8) failure to comply with recordkeeping requirements (14 CCR, § 18956).

PaintCare argues that the regulations impermissibly would penalize a manufacturer for not submitting a Plan or annual report even if it no longer sells paint in California. But the regulations limit enforcement under the penalty provisions to manufacturers selling paint in California. (See 14 CCR, § 18955, subd. (d) ["[a]ny manufacturer or retailer that offers architectural paint for sale in the state is subject to enforcement under this Article"].)

Finally, PaintCare argues that the regulations impose penalties for violations of unauthorized regulations. Because we find the regulations are not unauthorized, CalRecycle has regulatory authority to impose penalties for violations of its regulations implementing the Program.

28

## CONCLUSION

The regulations CalRecycle adopted to implement the Program are within the rulemaking authority the Legislature delegated to CalRecycle and do not enlarge or impair the scope of the Program.

## DISPOSITION

The judgment is affirmed. CalRecycle is to recover its costs on appeal.

FEUER, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.