Filed 5/27/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VALERO REFINING COMPANY – CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BAY AREA AIR QUALITY MANAGEMENT DISTRICT HEARING BOARD et al.,<br><br>    Defendants and Appellants. | A151004<br><br>(San Francisco County Super. Ct. No. CPF-15514407) |

An oil refinery, respondent Valero Refining Company California (Valero), undertook a costly, three-year construction project both to comply with a consent decree it entered into with the federal government and to upgrade portions of its facility.  The project resulted in a significant reduction in air pollution, and after constructing it Valero sought approval from the regional air quality management district to bank the resulting emissions reductions as valuable environmental credits.  It was denied a significant portion of the requested credits—first by the agency official charged with deciding the issue, and then by the hearing board to which it appealed.  In this administrative mandamus action, it asked the superior court to set aside the hearing board's decision.  The superior court did so, remanded the case back to the hearing board for reconsideration, and the air district has appealed.

The sole issue raised in this appeal concerns the standard of review that the air district's hearing board must apply when reviewing the agency official's decision denying approval of such emission reduction credits. Here, the agency official charged with considering the refinery's banking application in the first instance denied the credits in question because, applying a local air district regulation that prescribes the methodology for measuring emissions reductions, the official calculated a significantly lower reduction in air pollution than the refinery calculated. The refinery then appealed the official's decision to the hearing board, which upheld the official's interpretation of the regulation and on that basis declined to disturb the official's decision. The superior court ruled the hearing board did not apply the correct standard of review in deciding the refinery's appeal, because the hearing board erroneously declined to consider evidence that denial of the refinery's banking application was "unfair" under the circumstances.

We hold the air district hearing board's standard of review neither requires nor empowers it to consider whether applying the regulation to the particular case before it is in some broad sense fair, but instead is limited to a quasi-judicial inquiry entailing the exercise of its independent judgment to decide if the agency official's interpretation of that regulation was correct. The hearing board could, and did, appropriately consider Valero's evidence regarding the fairness of applying the regulation to Valero, but in another context: in addressing Valero's claim that the air district was equitably estopped from applying it here. The superior court erred in construing the hearing board's standard of review to permit, and indeed require, the hearing board to consider some other, more amorphous concept of "fairness." Accordingly, we reverse and remand the case to the trial court to address the

issues it did not reach, which we will not decide in the first instance on appeal.

## BACKGROUND

### A.     The Regulatory Framework

In California, regulatory oversight over sources of air pollution is divided between the State Air Resources Board which has exclusive control over emissions from motor vehicles, and 35 local and regional air quality management districts ("air districts") which have primary responsibility for the control of air pollution from all other sources.  (See Health & Saf. Code,[1] §§ 39002, 39003, 39500, 40000; *Friends of Outlet Creek v. Mendocino County Air Quality Management District* (2017) 11 Cal. App. 5th 1235, 1239, fn. 4.) This case, involving emissions from an oil refinery, concerns the scope of regulatory powers and duties at the air district level.

"Subject to the powers and duties of the state board," air districts are empowered to "adopt and enforce rules and regulations to achieve and maintain the state and federal ambient air quality standards in all areas affected by emission sources under their jurisdiction, and shall enforce all applicable provisions of state and federal law."  (§ 40001, subd. (a).)

The regulatory powers and duties of air districts are carried out at three levels.  Each air district has a governing board, composed of locally elected officials, which adopts substantive rules and regulations through a public hearing process.  (See §§ 40704.5, 40725, subd. (a), 40726.)  The governing board also appoints an air pollution control officer for the district, commonly referred to in regulatory parlance as the "APCO."  (§ 40750.)  The APCO possesses broad enforcement authority, with responsibility for

---

[1] Unless otherwise noted, all further statutory references are to the Health and Safety Code.

3

enforcing "[a]ll orders, regulations, and rules prescribed by the district board." (§ 40752.) The governing board also appoints a five-member hearing board, comprised of two members of the public and three professionals (one lawyer, one engineer and one medical expert with specialty in environmental medicine or related fields).[2] (§§ 40800, 40801.) The hearing board serves a hybrid function; it sits in a reviewing capacity in some types of cases (permit disputes (see §§ 42302.1 [issuance], 42302 [denial], 42306 [suspension], 42307 [revocation]) and appeals of emissions reduction credit banking decisions (§ 40713)) and it presides over other types of matters directly in the first instance, in a non-reviewing capacity (see §§ 42350, subd. (a) [variance applications], 42451, subd. (a) [abatement proceedings]). It is empowered to hold public hearings (§ 40808), subpoena witnesses (§ 40840) and "adopt rules for the conduct of its hearings" (§ 40807). Its decisions may be judicially reviewed by petition for a writ of mandate under Code of Civil Procedure section 1094.5. (§ 40864.)

Section 40709 requires each air district to adopt regulations establishing an air pollution emission offset system. (See § 40709.) Broadly described, an offset system enables owners of pollution sources who voluntarily reduce their air pollution emissions below the levels required by law to receive emission reduction credits ("ERC"), certified by the air district, that can be banked for future use or sold to other emission sources for profit. (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 603.)[3]

---

[2] No officer or employee of the district may sit on the hearing board. (§ 40803.)

[3] Specifically, section 40709 provides that every air district board "shall establish by regulation a system by which all reductions in the emission of air contaminants that are to be used to offset certain future increases in the emission of air contaminants shall be banked prior to use to offset future increases in emissions." (§ 40709, subd. (a).) The intent of the

4

Approval of emissions reductions through an offset system results in the issuance of a certificate evidencing the ownership of all approved reductions. (§ 40710.) Each air district offset system is subject to disapproval by the state board within 60 days of adoption. (§ 40709, subd. (a).)

The Legislature has prescribed two levels of agency action for regulatory approval of ERCs. Under section 40709, the initial decision rests with the APCO. (See § 40709, subd. (a) [emission reductions "shall be registered, certified, or otherwise approved by the district air pollution control officer before they may be banked"].) Pursuant to section 40713, if the APCO refuses to register, certify or otherwise approve an application for emission reductions under section 40709, the applicant may seek review of that decision by the district hearing board, which must hold a hearing to decide "whether the application was properly refused." (§ 40713.)

The underlying dispute here arose under regulations promulgated by the Bay Area Air Quality Management District (the "air district") concerning the banking of ERCs, which we summarize briefly for context. The air district's regulations state that emissions reductions calculated in accordance with its specified methodology qualify as "emission reduction credit" if they exceed the reductions required by law, rule, regulation or the district's Clean Air Plan. The regulations also specify that the reductions must be "real, permanent, quantifiable, and enforceable." Subject to exceptions not

system is to "provide a mechanism for districts to recognize the existence of reductions of air contaminants that can be used as offsets, and to provide greater certainty that the offsets shall be available for emitting industries." (*Id.*, subd. (b).) Substantively, it specifies that "[t]he system shall provide that only those reductions in the emission of air contaminants that are not otherwise required by any federal, state, or district law, rule, order, permit, or regulation" are eligible for being banked and used to offset future increases in air pollution emissions. (*Id.*, subd. (a).)

5

pertinent here, ERCs are then "bankable," meaning they can be deposited into the air district's "emissions bank."

The air district's regulations require an application to deposit an emission reduction in the district's emissions bank, on forms specified by the APCO. However, the regulations prohibit the submission of a banking application for pollutant sources that are subject to an abatement order or other similar formal order "until compliance with the emissions limitations which are the subject of the . . . order is achieved."

The dispute in this case turned on the meaning of regulation 2-2-605.1, which specifies one aspect of the methodology for calculating emission reduction credits. That regulation mandates the use of a "baseline period" to calculate emissions reductions that "consists of the 3 year period immediately preceding *the date that the application is complete*."[4] (Italics added.) The baseline period reflects the "before" input in what is essentially a "before and after" calculation mandated by the air district's regulations. In dispute here was the meaning of the phrase "the application." We will elaborate further below.

### B. These Proceedings

#### 1. The Construction Project

In 2005, Valero entered into a consent decree with the United States Environmental Protection Agency to settle litigation charging it with violations of the Clean Air Act. The consent decree required Valero to take

---

[4] In full, regulation 2-2-605.1 states: "The baseline period consists of the 3 year period immediately preceding the date that the application is complete (or shorter period if the source is less than 3 years old). The applicant must have sufficient verifiable records of the source's operation to substantiate the emission rate and throughput during the entire baseline period."

certain steps to reduce air pollution emissions at its refinery in Benicia, California, including installing some new equipment (a "scrubber," to scrub one type of pollutant from its fluid coker).

At issue here are reductions in air pollution that resulted from a project that included both the equipment necessary to enable compliance with the consent decree and additional upgrades Valero decided to undertake voluntarily at the same time. As described by Valero, the project "was an integrated project" that included decommissioning two furnaces and their associated equipment and replacing them with two more efficient furnaces, a set of modern catalytic reduction beds and two flue gas scrubbers. According to Valero, about $500 million of its $750 million total outlay for the project was spent to achieve emissions reductions beyond those required by the consent decree. Valero opted to undertake greater than required improvements in order to modernize its refinery, expand its processing capability and make significant emissions reductions that it could use in the future.

In April 2008, Valero filed a permit application with the air district requesting authority to construct these improvements.[5] Under the air district's "New Source Review" regulations (Regulation 2, Rule 2), the purpose of that permit review process was to ensure that certain new or modified sources of air pollution would achieve no net increase in emissions. (See § 40919, subd. (a)(2).)

---

[5] Technically, the furnace upgrades were addressed in a separate written amendment to the April 2008 permit application filed several months later, in December 2008. No party ascribes any significance to that fact, however, and in their briefing both parties treat the permit application as having been filed in April 2008. We will do the same.

Valero's permit application expressly anticipated seeking approval of credit for the resulting emissions reductions.  Its permit application (in section 7.0, entitled "Banking Credits") stated that the project would result in a reduction in emissions and that "Valero will submit an application to bank ERCs from these reductions under separate cover."  The air district deemed the permit application to be complete on May 16, 2008.  Subsequently, on December 15, 2008, the authority-to-construct permit issued.

On December 31, 2010, after two years of construction, Valero permanently shut down the two older furnaces, and about two months later, on February 23, 2011, the two new furnaces began operating.  Over the next several months, Valero underwent mandatory emissions testing of the new equipment so the district could verify it complied with all permit limitations.  The testing was completed and certified in September 2011.

## 2.    The APCO's Decision on Valero's Banking Application

In order to satisfy the air district's requirement that emissions reductions be "real, permanent, verifiable and enforceable" to qualify as an ERC, Valero believed it could not submit a banking application until the old furnaces had been permanently shut down, the new ones had been built and tested and Valero had modified its federal operating permit.[6]

After the improvement project was operational, Valero submitted an application (in March 2012) to bank the resulting emissions reductions.  In its banking application, Valero calculated its emissions reductions using the same baseline period it had used in its permit application:  a three-year

_____

[6] Valero obtained an amended federal operating permit in December 2010.

period ending in March 2008 (*before* it had performed the refinery upgrades), the date corresponding with its permit application.[7]

The air district had instructed Valero to use this baseline period in its permit application,[8] and it also was the same baseline period the air district used in engineering evaluations of the project it prepared in connection with Valero's permit application. The engineering evaluations had stated, "The baseline emissions shall be calculated in accordance with Regulation 2-2-605 [Basis: Banking]," which Valero had taken to mean that the same baseline period would be used to bank its emission reductions. The engineering evaluations also contained statements that led Valero to believe it could not submit a banking application until the project had been completed,[9] which was consistent with the district's regulation (2-4-401) that prohibits the submission of a banking application for pollutants that are the subject of a formal order such as the consent decree until after the emission limitations required by the order are achieved.

---

[7] Although Valero submitted its permit application in April 2008, and the application was deemed complete in May, March was the last month for which it had a complete set of emissions data to calculate its projected emissions reductions for the application.

[8] Valero's permit application had originally proposed an even earlier baseline period.

[9] For example, the evaluation stated that "Valero may bank any allowable excess of emissions reductions, in accordance with Regulation 2, Rule 4, after the project is built and the actual equipment has shut down." A district employee testified this statement meant only that a banking *certificate* could not issue until after the equipment had been shut down but did not mean Valero could not have submitted a banking *application* with its NSR permit application. The engineering evaluation also said that reductions "shall be eligible for banking after being demonstrated by source-testing or other means acceptable to the APCO."

In November 2014, after lengthy wrangling with Valero, the APCO issued a final decision authorizing the banking of a significantly lower number of ERCs than Valero sought. Interpreting regulation 2-2-605.1 to require the use of a three-year baseline period ending on the date Valero's *banking application* was deemed complete (May 15, 2012), the APCO measured the reductions against a more recent baseline period (May 2009 to May 2012) than the period in Valero's banking application (April 2005 to March 2008). The more recent baseline period included the period after Valero had shut down its existing furnaces but not yet brought the new ones online (i.e., when no emissions were generated), and extended into the post-project period when its emissions were lower than they had been prior to construction of the project. In all, Valero argued that the more recent baseline period captured about 18 months of post-change emissions rather than reflecting three full years of pre-change emissions. As a result, Valero argued, this baseline period was not representative of Valero's pre-change emissions, it understated the true level of emissions reductions Valero had achieved and using it to calculate Valero's emissions reductions for purposes of the banking application reduced the amount of ERCs Valero could receive.

### 3. Valero's Appeal to the Hearing Board

Valero appealed to the hearing board, and the matter proceeded to a five-day hearing at which both parties submitted pre-hearing briefs, presented evidence and argued.

Rule 3.6 of the hearing board rules (Rule 3.6) sets forth the board's standard of review, and the scope of this rule is the central issue in this appeal. It states: "The traditional legal presumption is one of the correctness of a regulatory agency's action. California Evidence Code Section 664 ('It is presumed that official duty has been regularly performed'). The Board may

10

not readily substitute its judgment for that of the District's expertise. The Board's role is to determine whether the APCO's interpretation of the applicable legal requirements in its action is fair and reasonable and consistent with other actions of the APCO and whether the APCO followed proper and appropriate procedures and guidelines. The burden of proof in an appeal is on the party challenging the APCO's action or finding. California Evidence Code Section 660. [¶] The scope of the Hearing Board's review is deference to the District's determination with the burden on the Appellant(s) to show the District's action was erroneous. Specifically, it is the Board's task to determine whether the agency's interpretation of its duty was reasonable and if its performance of that duty was regularly performed."

Valero argued the APCO's use of a baseline period ending on the completeness date of the banking application, rather than a pre-project baseline ending in March 2008, was legally erroneous. It argued that the "application" date as used in regulation 2-2-605.1 meant the completion date for the application that made the emissions reductions *enforceable*: either the application seeking an authority-to-construct permit in cases (like this one) that required such a permit, and in all other cases (such as emissions reductions resulting only from a shutdown of equipment), the banking application itself.

Valero also asserted in its reply brief before the hearing board that, under the circumstances, the air district should be equitably estopped from using the banking application completeness date to set the baseline period. Specifically, it argued that the district "should not be permitted to assert a different position on the baseline [period] than the one it [applied to Valero's permit application] in part because Valero detrimentally relied on the District's statements and actions . . . ."

The APCO argued that the "application" date used in regulation 2-2-605.1 meant only the banking application and not some other one. It argued that the "declining baseline" that results when an applicant delays submitting its banking application was adopted by design " 'to encourage applicants to complete their applications in a timely manner,' " and that the history of the current version of the rule reflected that intention. It also argued the plain language of the regulation supported its interpretation and the district's treatment of prior applications interpreted the regulation consistently to have the same meaning it was applying to Valero.

The APCO also addressed Valero's estoppel argument, both contending that it was not timely made and therefore was waived and opposing it on the merits. Valero responded to that procedural objection by invoking Rule 3.6 and contending the estoppel arguments in its reply brief were the same arguments it had previously advanced in its prehearing briefing about the hearing board's standard of review, just reframed.

After the five-day evidentiary hearing concluded, the hearing board by a divided 3-2 vote upheld the APCO's interpretation of the banking regulation and dismissed Valero's appeal. Applying Rule 3.6 in a ten-page written ruling, the hearing board concluded that "the APCO's interpretation of Regulation 2-2-605.1, and its application of that provision in this particular case, was fair and reasonable and consistent with other actions of the ACPO" and that the APCO "applied this interpretation fairly and consistently to Valero in the same manner as it has applied to other similarly-situated applicants seeking to bank emission reduction credits under similar circumstances." It reached this conclusion principally by examining the regulation's language, its regulatory context, evidence from various sources of

12

the air district's intent and two prior instances in which the district had applied the regulation similarly.

The hearing board also rejected Valero's equitable estoppel theory. It did so principally on factual grounds, finding there was nothing in Valero's permit application, the engineering evaluations, the permit, its banking application or the banking decision itself that was "inconsistent with the APCO's position that the baseline period for the banking application is based on the date of the banking application itself." It rejected Valero's theory that Valero had relied on assurances by air district staff that the same baseline period would be used for both the permit application and the later banking application, observing that there was no evidence that Valero ever confirmed such an understanding in writing. "Furthermore," it stated, "the position of an individual Air District staff member does not bind the agency as a whole, especially in cases where such a position was not reflected in the actual permitting documents that District staff prepared, and where it was not the position that the APCO took in approving the . . . permit application or banking application." It concluded that Valero had "not demonstrated that the APCO ever took an inconsistent position that would justify a conclusion that the APCO's position in this matter was unreasonable or otherwise improper."

The hearing board was not entirely unsympathetic to Valero, however. It concluded its ruling with advisory suggestions "encourag[ing]" the air district both to "reconsider the fairness of denying banking credits under these circumstances" and to "make its interpretation of the baseline rules clear to the public and to regulated entities that may be affected by it." Quite presciently anticipating these proceedings, it also encouraged the parties to engage in settlement discussions.

13

### 4. The Superior Court's Ruling

Valero then filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5 against the hearing board, the air district and the air district's APCO, Jack Broadbent (collectively, the "air district parties"). The first cause of action alleged the hearing board did not proceed in the manner required by law with respect to the proper standard of review. The second cause of action alleged the hearing board's ruling was not supported by the findings. And the third cause of action alleged the hearing board's findings were not supported by substantial evidence.

The superior court (the Honorable Harold E. Kahn) issued a writ of mandate, vacating the board's decision and remanding the matter for a new hearing. It ruled that the hearing board had prejudicially abused its discretion by not applying the correct standard of review under Rule 3.6. Specifically, it concluded that the hearing board had "improperly limited its consideration of Valero's appeal to the sole question of whether the APCO's interpretation of [regulation] 2-2-605.1 was reasonable." The court ruled that, "[r]ead as a whole and within the context of administrative law, Rule 3.6 quite clearly has its origins in and therefore should take its meaning from the case law on the independent judgment standard of review," observing that the rule "incorporates all aspects of the independent judgment standard," including "the presumption of correctness of the APCO's decision, the exercise of the Board's own judgment not in a way that is in derogation of the presumption of correctness, and the Board's obligation to set aside the APCO's decision when the Board's own judgment shows that the APCO's decision was erroneous." It concluded that the hearing board "erred in determining that Rule 3.6 required it to dismiss Valero's appeal once it determined that the APCO's interpretation of [regulation] 2-2-605.1 was

14

reasonable . . . . The Board's decision not to consider any of the facts adduced from the evidence received by the Board that persuaded all five members of the Board that the denial of Valero's application was *unfair* to Valero shows that, had the majority properly construed Rule 3.6, there is a significant possibility that one or more of the three persons who voted to dismiss Valero's appeal may have decided the appeal differently." (Italics added.) The superior court appears to have been addressing Valero's first cause of action and not to have reached Valero's second and third causes of action.

This appeal by the air district parties then followed.

## DISCUSSION

## I.

### *Appellate Jurisdiction*

Before turning to the merits of this appeal, we first address whether this appeal was timely filed and conclude that it was.

Under California Rules of Court rule 8.104 (rule 8.104), a 60-day deadline to appeal commences when "the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served," assuming (as is true here) that nothing has triggered an even earlier deadline. (Cal. Rules of Court, rule 8.104(a)(1)(A).) In this case, the air district parties filed their notice of appeal more than 60 days after the superior court clerk mailed the parties a file-stamped copy of the appealable judgment accompanied by a proof of service, and so we requested supplemental briefing concerning the appeal's timeliness.[10] (See *Hollister*

---

[10] Contrary to the suggestion by the air district parties, the appealable judgment was the court's order granting a writ of mandate, not a "judgment" that it subsequently entered. (See *Molloy v. Vu* (2019) 42 Cal.App.5th 746, 753, fn. 6.)

15

*Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 667 [if appeal is untimely " 'the court has no discretion but must dismiss the appeal of its own motion even if no objection is made' "]; Cal. Rules of Court, rule 8.104(b).)

The supplemental briefing disclosed that the superior court clerk's mailing was sent to an incorrect address. At the air district parties' request, we have taken judicial notice of the notice of change of address their counsel had filed in the superior court several months earlier. As now enlarged by that document, the record thus reveals that the superior clerk mailed the judgment to appellants' counsel's former address of record, not to counsel's current address of record.

Our research has revealed no authority addressing whether a clerk's mailing of notice of entry of judgment to counsel's former rather than current address of record commences the deadline to appeal under rule 8.104, but we have no hesitation concluding it does not.

Under rule 8.104, service "may be by any method permitted by the Code of Civil Procedure." (Cal. Rules of Court, rule 8.104(a)(2).). Code of Civil Procedure section 1013, which prescribes the requirements for valid mail service, requires papers to be addressed to "the office address *as last given by that person on any document filed in the cause.*" (Italics added.) That was not done here. After a notice of change of address has been filed with the court, as it was here, mail sent to a former address of record does not constitute proper service under section 1013. (See *Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 510 [notice of dismissal sent to prior address of record held ineffective]; see also *Gamet v. Blanchard* (2001) 91 Cal.App.4th 1276, 1286 [trial court notices sent to address not specified in party's notice of change of address were "faulty" and "inadequate," rendering resulting judgment void].)

16

Because the clerk's notice of entry of judgment was not properly served, it did not satisfy rule 8.104. "[S]trict compliance" with Code of Civil Procedure section 1013 is required (*Valley Vista Land Co. v. Nipomo Water & Sewer Co.* (1967) 255 Cal.App.2d 172, 174), and therefore "[n]otice of an appealable judgment or order mailed to an incorrect address is not sufficient to constitute legal notice" for purposes of calculating the deadline to appeal. (*Moghaddam v. Bone* (2006) 142 Cal.App.4th 283, 288 [notice of entry of judgment addressed with wrong zip code held ineffective]; see also *Triumph Precision Products, Inc. v. Insurance Co. v. North America* (1979) 91 Cal.App.3d 362, 365 [notice of entry of judgment listing correct street address for appellant's counsel but omitting law firm name]; *Valley Vista Land Co.*, at pp. 173–174 [notice of entry of judgment with incorrect street address].)

Citing dicta that notice of entry of judgment mailed to an incorrect address would trigger the 60-day deadline to appeal upon "proof notice was actually received" (*Moghaddam v. Bone, supra*, 142 Cal.App.4th at p. 288 [construing former Rules of Court rule 2]), Valero urges us to deem this appeal untimely because appellants *did* receive the clerk's mailing, a fact ultimately established by a declaration the air district parties filed with their reply supplemental briefing in order to clarify matters.[11] That is irrelevant,

---

[11] Before they did so, Valero filed a request asking us to take judicial notice of email correspondence between counsel corroborating the fact that appellants' counsel possessed a file-stamped copy of the judgment. We now deny that request, both because such materials are not a proper subject of judicial notice and they are irrelevant in light of the air district parties' acknowledgement they did receive the clerk's notice. We also deny the air district parties' request to take judicial notice of the materials that their counsel did, in fact, receive because the fact of receipt is established by their counsel's declaration.

however. The fact remains that Rules of Court rule 8.104 was not strictly complied with.

Although in other contexts, technical defects in giving notice are of no consequence where it can be inferred that notice was in fact received (see, e.g., *In re T.W.* (2011) 197 Cal.App.4th 723, 729-731 [zip code omitted from notice of writ advisement under Welf. & Inst. Code, § 366.26(*l*)(3)]), actual notice that an appealable judgment has been entered, including by receiving a notice of entry of judgment or a file-stamped copy of the judgment, does not trigger the deadline to appeal when notice of entry of judgment has not been given in accordance with rule 8.104. Even trivial errors in giving notice of entry of judgment, which this was not, cannot be excused.[12] (See *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 903 ["the older rule that technical defects in a notice of entry of judgment are excusable unless they are so egregious as to preclude actual notice of entry [citation] has not been applied to . . . rule 8.104(a)(1) . . . "].) Our Supreme Court has made clear that rule 8.104 does not require litigants to "guess, at their peril" whether documents mailed by the court clerk trigger the deadline to appeal. (*Alan*, at p. 905.) " 'Neither parties nor appellate courts should be required to speculate about jurisdictional time limits.' " (*Ibid.*)

The issue here is one of first impression, but courts have held that other attempts to give notice of the entry of judgment that failed strictly to comply with rule 8.104 were ineffective to trigger the appeal deadline even in situations when the service clearly did result in actual notice to the appealing party of the entry of judgment. We are aware of no case reaching a contrary

---

[12] Notice mailed to an address that is not an attorney's address of record is not a trivial, technical misstep. We are dealing here not with a misspelling, a wrong name or a missing zip code but, rather, a totally incorrect address as reflected in the trial court's records.

18

result.  (See *InSyst, Ltd. v. Applied Materials, Inc.* (2009) 170 Cal.App.4th 1129 [electronic service of notice that judgment was entered, with instructions and hyperlink to electronic file-stamped copy of judgment held insufficient]; *Citizens for Civic Accountability v. Town of Danville* (2008) 167 Cal.App.4th 1158, 1164 [similar]; see also *Thiara v. Pacific Coast Khalsa Diwan Society* (2010) 182 Cal.App.4th 51 [judgment mailed with cover letter but no proof of service]; *Keisha W. v. Marvin M.* (2014) 229 Cal.App.4th 581, 585 [personal service of restraining order but no evidence it was file-stamped]; *In re Marriage of Lin* (2014) 225 Cal.App.4th 471 [appellant personally present in court when restraining order issued, making order legally enforceable, followed by court clerk handing written copy to appellant's counsel].)  "Because appellate time limits are jurisdictional and cut off litigants' access to the courts, we strictly construe statutes and rules concerning the time in which to file a notice of appeal.  [Citation.]  'On numerous occasions, California courts have resolved ambiguities concerning appellate jurisdictional time limits to extend, rather than limit, the right to appeal, even where such interpretations may be considered hypertechnical in other contexts.' "  (*Lin*, at p. 474.)  Simply put, "mere knowledge" an appealable judgment has been entered is not sufficient to start the 60-day appeal period.  (*Johnson v. Ralphs Grocery Co.* (2012) 204 Cal.App.4th 1097, 1102, fn. 5; see also *Lee v. Placer Title Co.*, *supra*, 28 Cal.App.4th at p. 511 [actual notice "does not substitute for compliance with [Code Civ. Proc., §] 1013"].)

Valero also cites authority that "mail sent to a former address is deemed properly served for up to one year after the change of address because postal regulations require the postal service to forward first class mail at no charge during that period" (*Whitehead v. Habig* (2008)

19

163 Cal.App.4th 896, 903), and contends that because the clerk's notice in this case was sent within the one-year mail-forwarding window it should be deemed properly served absent proof it was not received. We do not agree. *Whitehead* is not on point, involved a different issue and opposite facts. It held that defendants who changed addresses but did *not* file a notice of change of address with the court were not denied due process when a notice of the trial date was mailed to their address of record, even though it was no longer their current address. (See *ibid*.) Unlike here, there was no issue in *Whitehead* about the validity of mail service under Code of Civil Procedure section 1013 much less the timeliness of a notice of appeal; quite sensibly, *Whitehead* simply held the defendants had no due process right to receive notice of the trial date at their new address when they never bothered to change their address of record on file with the court.

Nothing in either *Whitehead* or in postal mail forwarding regulations persuades us to interpret rule 8.104 in a manner that "would create a trap for the unwary." (*Citizens for Civic Accountability v. Town of Danville*, *supra*, 167 Cal.App.4th at p. 1164.) The rule "must be strictly construed to preserve the right to appeal when possible without doing violence to the language of the rule." (*Id*. at pp. 1163-1164.) Strict construction allows no room to depart from the requirement, incorporated by rule 8.104(a)(2) (service by any method "permitted by the Code of Civil Procedure"), that mail service be accomplished by addressing a notice of entry of judgment to "the office address as last given by that person on any document filed in the cause" (Code Civ. Proc., § 1013, subd. (a)). That was not done here.

The air district parties filed their notice of appeal within 60 days of the date that Valero's counsel served them with a (properly addressed) notice of

20

entry of judgment.  Accordingly, their appeal is timely.  (See Cal. Rules of Court, rule 8.104(a)(1)(B).)

## II.

### *The Hearing Board Applied the Correct Standard of Review.*

The legal issue we are asked to decide in connection with the air district's banking decision is very narrow, and so we begin by clarifying what is not at issue.  We are not asked to decide whether the air district should be *estopped* from using an emissions baseline period ending on the date of Valero's banking application, a theory Valero advanced before the hearing board but did not raise in the first cause of action of its petition for writ of mandate in the superior court and does not raise here.  We also are not asked to decide whether the APCO and the hearing board *correctly interpreted* the air district's banking regulation to require the use of that emissions baseline period rather than the (more favorable) baseline period Valero used in its permit application.  The merits of that issue were not before the superior court in Valero's first cause of action and are not before us now.[13]  The sole legal question we are asked to decide is whether the hearing board applied the proper standard of review in deciding Valero's appeal.  That is all.

We review this legal question de novo.  In reviewing an agency's decision on a question of law " ' "the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal." ' "  (*Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1174.)

---

[13]  We express no opinion whether these merits issues are encompassed by either of the two remaining causes of action that were mooted by the superior court's ruling.  The parties are free to address the scope of those two other claims on remand.

The air district parties argue that the hearing board correctly interpreted and applied its standard of review, and therefore the superior court erred in vacating the hearing board's decision and directing it to reconsider Valero's appeal. They, along with several amici who have submitted briefs in support of their position,[14] assert that Rule 3.6 requires the board to determine *only* whether the APCO's decision was correct as a matter of law and does not empower the board to depart from the law based on board members' individual views as to whether applying the regulation in the circumstances before it is substantively fair. The air district parties also assert, secondly, that the board engaged in exactly the inquiry required by Rule 3.6 and the superior court erred in concluding otherwise.

Valero, on the other hand, contends Rule 3.6 "goes beyond requiring simply a check on the 'legal correctness' of APCO regulatory interpretations" and, instead, broadly empowers the hearing board to "go[] beyond the bare interpretation of the regulations at issue" and consider " 'basic principles of fundamental fairness' " in deciding an appeal. It says that "Rule 3.6 specifies a multi-faceted standard of review under which both facts and law—and not just mere interpretation of regulations—may be important in determining whether a banking application was 'properly refused' by the APCO." Indeed, although Valero's appellate briefing is somewhat opaque about the contours of what Rule 3.6 supposedly entails, and it backpedals in its response to amicus briefing (inconsistently),[15] it was quite clear in its briefing before the

<hr>

[14] There are two amicus briefs, one submitted by the California Air Resources Board and the other by four regional air quality and air pollution control districts (South Coast, Sacramento, San Joaquin and Monterey Bay).

[15] In that filing, Valero asserts repeatedly that "fairness" pertains only to the proper *interpretation* of the applicable regulations, arguing for example that "the Hearing Board was entitled under Rule 3.6 to address the competing interpretations and to adopt the one that avoided (rather than

22

hearing board. There, Valero expressly conflated the standard of review required by Rule 3.6 with the principles of equitable estoppel, telling the hearing board there was in fact no difference ("they are the same arguments—indeed, the same issues"). Here, since the board members expressed concerns about the substantive fairness of the outcome—and indeed, in advisory comments, even encouraged the APCO to "reconsider the fairness of denying banking credits under these circumstances"—Valero says that the board prejudicially misconstrued its standard of review and it urges us to affirm the superior court's ruling. Second, and relatedly, Valero also faults the hearing board for considering only whether the APCO's interpretation was "reasonable" and nothing more.

We agree with the air district parties.

### A. The Hearing Board Is Not Empowered to Review the APCO's Decision for "Fundamental Fairness."

We start with the general principle that the hearing board was required to exercise its independent judgment in deciding Valero's appeal. It could not blindly ratify the APCO's decision but, rather, was required to decide the merits of the issues for itself. On appeal, this basic proposition does not appear to be in contention. The superior court concluded that the hearing board's standard of review encompassed the obligation to exercise independent judgment; Valero argues the trial court "properly recognized that Rule 3.6 effectively restates the independent standard of review"; and the air district parties embrace this understanding of the hearing board's standard of review as well. They argue the hearing board properly "applied

_____

caused) manifest injustice." On the other hand, it also asserts repeatedly in that filing that "Rule 3.6 plainly goes beyond requiring simply a check on the 'legal correctness' of APCO regulatory interpretations," and gives the hearing board "wide latitude to fashion an appropriate remedy."

23

its own independent judgment," and equate the board's standard of review with the principles of judicial review prescribed in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*). Under *Yamaha*, our Supreme Court's seminal decision establishing the framework for assessing the amount of judicial deference an administrative interpretation is entitled to by the courts, " 'The standard for judicial review of agency interpretation of law is *the independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Id.* at p. 8.) Moreover, our independent research has revealed cases in which an independent review standard has been held applicable to administrative entities acting in a reviewing capacity that, like the hearing board, have the power to take evidence, hear from witnesses, entertain argument and render a decision. (See *Quintanar v. County of Riverside* (2014) 230 Cal.App.4th 1226, 1233-1235 (*Quintanar*) [hearing officer presiding over appeal of employee disciplinary proceeding pursuant to county collective bargaining agreement required to exercise independent judgment regarding appropriate discipline]; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 1150, 1157 [county civil service commission must "independently review the facts and law" in appeal from disciplinary order]; accord, *Lopez v. Imperial County Sheriff's Office* (2008) 165 Cal.App.4th 1, 5 [county appeals board presiding over appeal of employee termination].) "In any review process, a provision that the reviewer must hold a full evidentiary hearing tends to show that the reviewer is supposed to exercise independent judgment; this is true regardless of whether the review process is contractual or statutory. Likewise, a provision, whether contractual or statutory, that a reviewer can 'modify' a decision tends to show that the reviewer is supposed to exercise

24

independent judgment."[16] (*Quintanar*, at p. 1235.) There is no reason to conclude the district's enactment of Rule 3.6 was intended to circumscribe the board's review powers more narrowly. And, as said, no party contends otherwise.[17]

Contrary to the trial court's ruling, however, the hearing board's exercise of independent judgment under Rule 3.6 does not encompass a broader inquiry than simply determining whether the APCO's interpretation and application of the applicable regulations was correct as a matter of law. It does not allow (much less require) the hearing board to decline to apply the regulations if, in the hearing board's view, applying them in the case before it would be "unfair."[18] The trial court erred in holding otherwise.

---

[16] The hearing board's rules specify it may do this.

[17] Although the cases we located in our independent research held that little or no deference was owed in the circumstances presented there (see *Quintanar*, *supra*, 230 Cal.App.4th at p. 1235 ["Based on the wording chosen by the parties to the [memorandum of understanding], we conclude that the Department gave up any requirement that the hearing officer defer to its discretion"]; *Kolender v. San Diego County Civil Service Com.*, *supra*, 132 Cal.App.4th at p. 1157 [sheriff's decision was "not due substantial deference"]), none involved an agency's interpretation of its own regulation, nor a rule specifying a particular standard of review such as Rule 3.6 expressly requiring "deference to the agency's determination." Here, although Valero appears to blow hot and cold on the subject, ultimately we understand all parties to agree that Rule 3.6 incorporates the principles of judicial review expressed in *Yamaha* and its progeny. The parties have not specified how those factors would apply here, however, and we are not asked to decide that issue.

[18] The parties disagree as to how much deference *we* must give the *hearing board's* interpretation of its own standard of review embodied in Rule 3.6, but it is unnecessary to decide that issue because we readily agree with the board's interpretation even if we give it no deference.

25

First, no statute authorizes the district to promulgate a regulation empowering its hearing board to engage in such an expansive and amorphous "fairness" inquiry. (See *PaintCare v. Mortensen* (2015) 233 Cal.App.4th 1292, 1305 ["An administrative agency 'has only as much rulemaking power as is invested in it by statute' "]; *Friends of the Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 117 [similar].) The Legislature has specified that *the APCO* is legally required to follow the law, i.e., to enforce "[a]ll orders, regulations, and rules prescribed by the district boards" (§ 40752), and in the banking context in particular, section 40713 requires the hearing board to determine only whether the APCO "properly refused" a banking application.[19] It follows that the hearing board is charged with deciding only whether the APCO "properly" enforced the district's orders, regulations and rules on the subject. Nothing more. (See *Industrial Indem. Co. v. City and County of San Francisco* (1990) 218 Cal.App.3d 999, 1009 ["A court must construe an administrative regulation in light of the enabling statute's intent"].) Valero asserts that "[i]t makes no sense to equate 'properly refused' with 'legally correct.' " But that rather astonishing position makes no sense. Indeed, elsewhere in its briefing Valero says the opposite, acknowledging that the statutory "properly refused" standard entails reviewing for legal *error*.[20]

---

[19] The Legislature has utilized similar language to describe the scope of other types of appeals before the hearing board. (See §§ 42302 [whether permit "was properly denied"], 42302.1 [whether permit "was properly issued"], 42306 [whether permit "was properly suspended"].)

[20] Valero points out in its respondent's brief that Rule 3.6 expressly requires the hearing board to "determine whether 'the District's action was erroneous' " which Valero says "echoe[s] the statutory requirement" under section 40713 "that the Board determine 'whether the application was properly refused.' "

We also recognize, of course, the hearing board is authorized to "adopt rules for the conduct of its hearings" (§ 40807), but the fact " '[t]hat an agency has been granted *some* authority to act within a given area does not mean that it enjoys *plenary* authority to act in that area.' " (*Friends of the Kings River v. County of Fresno, supra*, 232 Cal.App.4th at p. 117.) That limited grant of *procedural* power (governing the "conduct" of hearings), cannot reasonably be construed as a grant of *substantive* authority to disregard duly enacted administrative regulations. Not even Valero seriously points to section 40807 as a source of legislative authority for the expansive interpretation of Rule 3.6 it advocates.[21]

Second, nothing in the plain language of Rule 3.6 itself suggests the hearing board is to engage in anything other than a traditional quasi-judicial administrative review exercise. The rule states that the hearing board's "role" is "to determine whether the APCO's interpretation of the applicable legal requirements is fair and reasonable and consistent with other actions of the APCO" and "to determine whether the agency's interpretation of its duty was reasonable," while also incorporating the presumption of correctness, commanding "deference" to the District's decision, and providing that the hearing board "may not readily substitute its judgment for that of the District's expertise."

Valero places great reliance on the rule's mention of "fair and reasonable," but that language does not support its expansive interpretation

---

[21] Apart from a generalized string citation, Valero cites section 40807 in one sentence of its response to amicus briefing where it asserts, without discussion or analysis: "The Code allows all air district hearing boards discretion to carry out their statutory review authorities by adopting their own rules for hearing administrative appeals of banking decisions and other determinations by air district staff. *See* [Health & Saf. Code,] § 40807."

of Rule 3.6.  The rule expressly says the relevant question is whether the APCO's "*interpretation* of the applicable *legal requirements* of the law is "fair and reasonable," not whether *applying* that law is fair in the particular case. This language does nothing more than reflect fundamental principles of constitutional, statutory and regulatory construction, using terminology regularly employed by both the United States Supreme Court and our Supreme Court.  (See, e.g., *Thompson v. Oklahoma* (1988) 487 U.S. 815, 821, fn. 4 [constitutional provision should not be given " 'a crabbed interpretation that robs [it] of its full, fair and reasonable meaning' "]; *People v. Freeman* (1988) 46 Cal.3d 419, 425 [statute will be construed in a manner that is constitutional where it is capable of such meaning " 'by fair and reasonable interpretation' "]; *Walters v. Bank of America Natl. Trust & Savings Assn.* (1937) 9 Cal.2d 46, 52 [statutes must be "reasonably and fairly interpreted . . . so as to give effect, if possible, to the expressed intent of the legislature"]; *State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 79 [interpreting insurance regulations based on "a fair reading of the regulations as a whole"].)  Likewise, Rule 3.6's directive to consider whether the APCO's interpretation of the law is "consistent with other actions of the APCO" simply reflects one factor under the *Yamaha* framework for assessing the amount of deference to give an agency's interpretation of law.  The reviewing tribunal considers whether "the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing,' " because " '[a] vacillating position . . . is entitled to no deference.' "  (*Yamaha*, *supra*, 19 Cal.4th at p. 13.)

We also find support for the air district parties' construction of Rule 3.6 in the academic commentary.  Both parties cite a law review article authored by Santa Clara University Law Professor Kenneth Manaster, who served as

28

Chairman of this very hearing board for more than 10 years (1978-1989) and represented Valero in this case. (Manaster, *Fairness In The Air: California's Air Pollution Hearing Boards* (2006) 24 UCLA J. Envtl. L. & Pol'y 1, 1, fn. *.) Professor Manaster describes the standard of review governing air district hearing boards in language that virtually mirrors the text of Rule 3.6, with no mention of a duty to consider whether applying the law in any given case would be "fair" but, on the contrary, making clear that a hearing board's duty is solely to ascertain whether district staff properly followed the law. According to Professor Manaster: "[T]he inquiry . . . should be *whether the district staff has made a fair, reasonable interpretation of the applicable legal requirements* in its action . . . . The hearing board's usual function should be to determine *whether the staff view in the permit dispute*[22] *falls within a sensible application of the language and purpose of the pertinent regulations or other requirements*. [¶] This perspective is consistent with the traditional legal presumption of the regularity and correctness of administrative action. This presumption means that the burden of proof in a permit dispute should be on the party challenging the district staff's action or finding. It also means that the hearing board should not lightly disagree with the staff's determinations. *A hearing board in permit cases is operating analogously to the role of an appellate court reviewing administrative agency action*. This is in contrast to the board's function in variance or abatement cases, where the better analogy is the work of trial courts determining matters in the first instance. In short, the hearing board should not substitute its judgment in permit cases for that of the expert, full-time staff of the APCD. [¶] This does not mean, of course, that this oversight and review function of the hearing

---

[22] The author characterizes ERC banking applications as a type of "permit dispute." (See Manaster, 24 UCLA J. Envtl. L. & Pol'y, at p. 79.)

29

board should be forfeited through automatic, uninformed deference to the staff." (Manaster, 24 UCLA J. Envtl. L. & Pol'y at pp. 80–81, italics added, fns. omitted.) Professor Manaster's views are at odds with Valero's assertion that the hearing board is *not* "like any reviewing tribunal" subject to " 'familiar judicial principles' " that "apply to reviewing *courts* evaluating agency interpretations," and Valero's view that Rule 3.6 does *not* "limit[] the Board to a regulatory interpretation exercise to determine whether the APCO properly effectuated the intent of the Board of Directors in adopting the regulations."

Finally, both the air district parties and the amici caution that upholding the expansive construction of Rule 3.6 that Valero urges would cause great regulatory uncertainty. As the California Air Resources Board puts it, "If hearing boards, exercising independent judgment, could reverse an APCO's action, even after determining that the APCO applied a reasonable legal construction in conformance with procedural requirements, they could functionally repeal or amend air districts' technical permit regulations on a case-by-case basis. That is not the role of hearing boards, which do not enact substantive regulations and are not charged to enforce them.[23] A broad expansion of the hearing board's scope of review, sought by Valero and sanctioned by the Superior Court, would destabilize public health controls by frustrating the public rulemaking process and engendering regulatory uncertainty." Such an approach would threaten to decrease transparency in decision-making, it tells us, decrease the ability of third parties to rely on APCO decisions, and ultimately impede the California Air Resources Board

---

[23] As we have discussed, it is the air district's *governing* board, acting in a quasi-legislative capacity, that adopts substantive rules and regulations. (See p. 3, *ante*.)

30

itself from fulfilling its statutory mandate to coordinate statewide pollution control activities.

Administrative review depends no less on proper adherence to the law than does judicial review. *Courts* cannot refuse to follow the law " 'simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem.' " (*San Diego County Water Authority v. Metropolitan Water Dist.* (2004) 117 Cal.App.4th 13, 28.) As this court has recognized, proper interpretation of the law might produce results that are "uneven, perhaps even unfair," but that does not empower courts to declare the result unlawful. (*Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252, 275.) "The wisdom and expediency of the choices made by the political branches are not subject to judicial recalibration." (*Ibid*.) The same is true of the hearing board carrying out its statutory mandate to review whether the APCO's decision was "properly refused" under regulations duly promulgated by the air district.

That said, the hearing board did consider Valero's "fairness" evidence, and addressed it in a context that was appropriate, namely, in evaluating Valero's equitable estoppel claim. (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 402-404 [largely factual claims of estoppel should be heard first in administrative hearing despite absence of specific statutory authorization for such defense].) As the parties recognized in their pre-hearing briefs, equitable estoppel is an established doctrine with well-defined elements, including intentional or negligent inducement of reliance and actual reliance. The APCO disputed both of these elements, and as we have already discussed, the hearing board rejected Valero's estoppel argument on several grounds, in effect finding no acts or statements by APCO that were intended to or negligently caused Valero's reliance. In the first cause of action in its

31

writ petition, Valero did not challenge the hearing board's factual determinations, and the issue of whether those findings have the requisite support therefore is not before us. In any event, we reject the trial court's suggestion that the hearing board chose not to consider Valero's evidence at all and its conclusion that the hearing board should have determined whether that evidence violated some nebulous concept of fairness untethered from equitable estoppel.

## B. The Hearing Board Properly Applied Rule 3.6.

Although the principal focus of the parties' briefing, as well as the amicus briefing, is on the foregoing fairness issue, the superior court also misconstrued the hearing board's decision as more deferential than it in fact was, and on appeal Valero does too. As the air district parties argue, the hearing board did not solely consider whether the APCO's interpretation of the banking regulation was reasonable. Rather, it acknowledged and applied the very standard that Rule 3.6 required: namely, "whether the APCO's interpretation of the applicable legal requirements in its action is fair and reasonable and consistent with other actions of the APCO." There is simply no other way to read the board's decision.[24]

First, the hearing board quoted Rule 3.6 and said that it had "applied this standard in reaching its decision in this matter." Next, it found that

---

[24] Although both parties quote liberally from comments by individual board members at the hearing, we review only the hearing board's written ruling. Oral comments or statements made during deliberations cannot be used to impeach the board's final decision. (See, e.g., *Key v. Tyler* (2019) 34 Cal.App.5th 505, 539, fn.16 [court's comments from the bench "were not final findings and cannot impeach the court's subsequent written ruling"]; *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300-301 ["we disregard the trial court's tentative ruling and the comments the court made [at the hearing], and consider only the trial court's final order on the motion"].)

"[t]he APCO's interpretation of Regulation 2-2-605.1, and its application of that provision in this particular case, was fair and reasonable and consistent with other actions of the APCO.  The APCO's interpretation of Regulation 2-2-605.1 was reasonable, and the APCO applied this interpretation fairly and consistently to Valero in the same manner as it has applied it to other similarly-situated applicants seeking to bank emission reduction credits under similar circumstances."  It then spent three pages explaining its reasons, which were based upon:  (1) the language of the regulation, (2) its regulatory context, (3) evidence of the district's regulatory intent contained in a staff report issued when the regulation was adopted, (4) a prior version of the regulation, and (5) the board's factual finding that the district had applied the regulation the same way to two similarly situated applicants in the past.  The board then concluded:  "The Hearing Board therefore finds that the APCO's interpretation of Regulation 2-2-605.1, and its application of Regulation 2-2-605.1 to Valero's banking application in this case, *was fair, reasonable, and consistent with other actions of the APCO*, for all of the reasons outlined above."  (Italics added.)

## C.    Conclusion

Because the hearing board applied the correct standard of review, the superior court erred in granting a writ of mandate on Valero's first cause of action.  The air district parties also ask us to exercise our discretion to dismiss the other two claims Valero asserted in its writ petition that the superior court did not reach.  But the air district parties have briefed these issues in a conclusory manner that does not facilitate meaningful appellate review, the superior court did not address these other claims which were clearly mooted by its ruling on the first cause of action, and we believe it should decide those causes of action in the first instance.

## DISPOSITION

The judgment is reversed.  Appellants shall recover their costs.

_____

STEWART, J.


We concur.


_____

KLINE, P.J.


_____

RICHMAN, J.


*Valero Refining Co. v. Hearing Bd. of the Bay Area Air Quality Management Bd.* (A151004)


35

Trial Court:San Francisco County Superior Court

Trial Judge: Hon. Harold E. Kahn

Counsel:

Brian C. Bunger, Alexander G. Crockett for Defendants and Appellants.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Annadel A. Almendras, Connie P. Sung, Ryan R. Hoffman, Deputy Attorneys General for California Air Resources Board, as Amicus Curiae on behalf of Defendants and Appellants.

Bayron Gilchrist, Barbara Baird, Mary J. Reichert for South Coast Air Quality Management District, as Amicus Curiae on behalf of Defendants and Appellants.

Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk, John T. Hansen, Michael S. McDonough, Stacey C. Wright, for Plaintiff and Respondent.